IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA

       vs.                Criminal No.
                        MJ No. 24-1794
MOHAMAD HAMAD and TALYA LUBIT    CR No. 24-257


-----


Transcript of Proceedings held on Wednesday,
November 6, 2024, in the United States District Court, 700
Grant Street, Pittsburgh, PA  15219, before Honorable Kezia
O. L. Taylor, United States District Magistrate.


-----


APPEARANCES:

  For the Government:   U.S. Attorney's Office
                      by Carolyn Bloch, Esq.


  For Defendant        Federal Public Defenders
  Hamad:              by Yemi Olaiya, Esq.

  For Defendant        Frank Walker Law
  Lubit:              by Frank Walker, Esq.

  Court Reporter:      Teresa M. Benson, RMR, FCRR
                      700 Grant Street
                      Suite 6260
                      Pittsburgh, PA  15219


Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

1                               **I N D E X**

2      **WITNESS**                                                **PAGE**

3      **DETECTIVE DAVID DERBISH**
               Direct by Ms. Bloch                              5
4              Cross by Ms. Olaiya                              50
               Redirect by Ms. Bloch                           77
5              Recross by Ms. Olaiya                            80
               Redirect by Ms. Bloch                           82

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2        (In open court.  Defendants present with counsel.)

 3            THE COURT:  Good afternoon.  So we are scheduled

 4    today for two proceedings this afternoon, the first proceeding

 5    in the matter of U.S.A. versus Hamad, et al., concerning two

 6    Defendants at MJ No. 24-1794.  I was just informed it is

 7    possible that I'm not being heard in the back.  There we are.

 8    Magic.

 9            As I was saying -- I'll start over -- we are

10    scheduled for two proceedings here today, the first being the

11    preliminary examination on the Criminal Complaint that's

12    pending at 24-mj-1794; the second by way of motion is a motion

13    for an evidentiary hearing as it relates to the condition of

14    pretrial release concerning Mr. Hamad.

15            My understanding from that motion is that the

16    evidence that is deduced at the preliminary hearing will be

17    the evidence that is needed in order for counsel to make their

18    move here in court to amend or recommend amending the Order

19    setting forth the conditions of release.

20            So with that said, I'll get started.  First on behalf

21    of the government, will you please identify yourself for the

22    record.

23            MS. BLOCH:  Certainly.  Good afternoon.  Carolyn

24    Bloch on behalf of the United States.

25            THE COURT:  Thank you.  And counsel on behalf of
```

1    Mr. Hamad, please identify yourself for the record.

2         MS. OLAIYA:  May it please the Court, Yemi Olaiya on

3    behalf of Mr. Hamad.

4         THE COURT:  Thank you, Attorney Olaiya.  Counsel on

5    behalf of Ms. Lubit, please identify yourself for the record.

6         MR. WALKER:  Good afternoon, Your Honor.  May it

7    please the Court, Frank Walker on behalf of Ms. Lubit.

8    Ms. Lubit is present in person.

9         THE COURT:  So a couple things before we actually get

10   underway with the presentation of testimony and other evidence

11   in this matter.  I remind the parties that as it relates to

12   the preliminary examination on the Criminal Complaint, this is

13   a probable cause hearing.  As the parties may be aware and

14   counsel certainly are aware that as it relates to a probable

15   cause hearing, the goal of the Court is to understand whether

16   or not there is a reasonable belief that the Defendants

17   committed the violations that have been set forth in the

18   Criminal Complaint, that being 18 U.S.C. Section 371,

19   conspiracy to commit an offense against the United States from

20   in and around July 2024 through or about July 29, 2024, as

21   well as 18 U.S.C. Sections 247(c), 247(d)(5) and (2) regarding

22   defacing and damaging religious real property on or about

23   July 29, 2024.

24        To the Defendants, as you probably are aware, at this

25   proceeding, a couple things will happen.  There will be the

1    evidentiary hearing, argument and a judicial ruling.  Motions

2    to suppress are not to be considered.  The Federal Rules of

3    Evidence will not apply, and I will caution counsel that this

4    proceeding will not turn into an extensive discovery for

5    trial.

6         With that said, to the Defendants, if you choose, you

7    will have an opportunity to be heard, to question the adverse

8    witness, so with that said, I'll turn to AUSA Bloch on behalf

9    of the government to proceed.

10        MS. BLOCH:  Certainly, Your Honor.  Thank you.  The

11   government calls Detective David Derbish.  Your Honor, may I

12   take a seat?

13        THE COURT:  You may.

14        MS. BLOCH:  Thank you very much.

15                **DETECTIVE DAVID DERBISH**

16            **was duly sworn and testified as follows:**

17                 **DIRECT EXAMINATION**

18   BY MS. BLOCH:

19   Q.  If you could please state your name and spell your last

20   name for the record.

21   A.  My name is David Derbish, D-E-R-B-I-S-H.

22   Q.  Mr. Derbish, how are you currently employed?

23   A.  I'm employed by the FBI's joint terrorism task force as a

24   task force officer.  My employer is the City of Pittsburgh

25   Bureau of Police.  I have been there since 2009, and prior to

1    that, I was a military police sergeant with the United States

2    Army.

3    Q.  Okay.  As part of your role as a task force officer with

4    the FBI, do you participate in various investigations

5    undertaken by the FBI that involve both issues of both

6    domestic and international terrorism as well as other related

7    offenses such as hate crimes and things of that nature?

8    A.  Yes.  As part of my job, I hold a top secret security

9    clearance, so I do work both international and domestic

10   terrorism along with any other crime that the FBI would ask me

11   to work on, and my primary focus is within the City of

12   Pittsburgh where I'm employed.

13   Q.  How long have you been serving on the task force with the

14   FBI?

15   A.  Approximately three years.

16   Q.  Okay.  Have you participated in investigations that

17   involve international terrorism organizations?

18   A.  Yes, I have.

19   Q.  Is one such organization that you have come to be familiar

20   with that of Hamas?

21   A.  Yes, it is.

22   Q.  If you could just briefly inform the Court of what Hamas

23   is so that the record is clear on that point.

24   A.  Hamas is the largest and most capable militant group

25   within the Palestinian territories, and one of the two

1    territories' major political parties.

2           Hamas emerged at approximately 1987 during the first

3    Palestinian uprising.  The group is committed to an armed

4    resistance against Israel and a creation of an Islamic

5    Palestinian state in Israel's place.

6    Q.  On October 7, 2023, there were terrorist acts committed in

7    Israel, is that correct, and those acts were committed by

8    members of the Hamas organization?

9    A.  Yes.  On that date, Hamas sent approximately 2,000 armed

10   fighters into Israel across the border.  They entered

11   primarily civilian towns, including farms, and they launched a

12   wave of violence against civilians.

13          During that time, hundreds of civilians, including

14   Americans, were killed.  Others were kidnapped, taken hostage

15   and brought to the Gaza strip by Hamas.

16   Q.  Since that October 7th terrorist incident, there has been

17   an ongoing war in Israel, rather between Israel and the

18   Palestinian state, most importantly, Hamas in control of that

19   state.  Stemming from that war, I should say, and the

20   incidents of October 7th, have there been locally, that is,

21   within the Western District of Pennsylvania and specifically

22   Pittsburgh, lawful protests regarding various aspects of

23   ongoing war between Israel and Hamas?

24   A.  Yes.  There has been many lawful protests.

25   Q.  In connection with some of those lawful protests, have

1    there been reports and/or investigations of incidents of local

2    vandalism, incidents targeting residents and/or businesses

3    that either support Israel or are perceived to support Israel?

4    A.   Yes.   Since October 7, 2023, there has been hundreds of

5    incidents within the City of Pittsburgh, primarily criminal

6    mischief incidents, broken windows, damaged vehicles,

7    residences that have been spray-painted, sidewalks in front of

8    residences have been spray-painted, and the common issue at

9    hand was the places that were spray-painted or damaged

10   displayed some support of Israel or were connected to Jewish

11   institutions.

12   Q.   Specifically, Detective Derbish, on July 29, 2024, just a

13   few months ago, did you become aware of a vandalism incident

14   that had been reported by the Chabad of Squirrel Hill?

15   A.   Yes, I did become aware of that.   Chabad had reported that

16   the outer wall of their property at 1700 Beechwood Boulevard,

17   which is at a corner of Beechwood and Forbes, was

18   spray-painted with the words "Jews 4 Palestine" in red

19   spray-paint, and in addition to that, there was a red upside

20   down triangle spray-painted on the wall of the synagogue.

21   Q.   Before we get further into the details of the

22   investigation, after you were informed that there had been

23   this vandalism incident, did you become personally involved in

24   an investigation of the perpetrators who may have committed

25   the acts?

1   A.  Yes, I did.  The incident was reported to Zone 4

2   Pittsburgh police who then circulated information, pertinent

3   information and photographs, to the rest of the Pittsburgh

4   police department.

5   Q.  In your case as a task force officer with the FBI, did you

6   join forces with the FBI in order to assist the Pittsburgh

7   Bureau of Police in that investigation?

8   A.  Yes, I did.  And I also would have spoken, along with

9   other Pittsburgh police detectives, with members of the CMU

10  police department and University of Pittsburgh police

11  department who all have surveillance capability cameras and

12  license plate readers in the area which aids us in solving

13  crimes on a daily basis.

14  Q.  Okay.  You have before you, do you not, what is marked as

15  Government's Exhibit No. 1, which purports to be the Complaint

16  and the affidavit in support of the Complaint filed in this

17  case.  Have you seen this document before?

18  A.  Yes, I have.

19  Q.  Have you read it in its entirety?

20  A.  Yes, I have.

21  Q.  You are not the affiant on this particular document, but

22  this document, in fact, reflects the investigation that was

23  undertaken by you and other agents of the FBI?

24  A.  Yes.  I was present for almost all of the facts within

25  this case.

1   Q.  Okay.

2          MS. BLOCH:  Your Honor, the government moves for

3   admission of Government Exhibit 1.

4          THE COURT:  Any objection?

5          MS. OLAIYA:  No objection, Your Honor.

6          THE COURT:  Any objection, Mr. Walker?

7          MR. WALKER:  Your Honor, a question in aid of an

8   objection.  Sir, you stated you were present during the

9   majority of the facts in the affidavit.

10          THE WITNESS:  That's correct.

11          MR. WALKER:  Can you specify which portion?

12          THE WITNESS:  Well, yes.  So Section No. 1,

13   "Introduction and Agent Background" is not involving me.

14          MS. BLOCH:  Your Honor, if I could just interrupt for

15   one second, maybe I can ask a question that would clarify and

16   assist you.

17          MR. WALKER:  Sure.

18   BY MS. BLOCH:

19   Q.  To the extent that you did not participate in a particular

20   investigative endeavor reflected in this document, did you

21   obtain the details of that investigative endeavor in

22   furtherance of this investigation from the agent or officers

23   that did, in fact, participate in that particular aspect?

24   A.  Yes.  If I did not take part in these acts specifically,

25   then I was informed of them.

1    Q.  Again, you have read this, the affidavit, in its entirety,

2    and to the best of your knowledge, is it true and correct?

3    A.  Yes, it is.

4         MR. WALKER:  No objection, Your Honor.

5         THE COURT:  Thank you.  So admitted.

6    Q.  Okay.  So we were talking about the July 29th

7    investigation or rather the report of the vandalism of the

8    Chabad, and you started to describe the damage that had been

9    done to the Chabad.  But before we go to that place, if I can

10   ask you a question about the Chabad itself.

11        You indicated it was located in Squirrel Hill on Beechwood

12   Boulevard, rather at the corner of Forbes and Beechwood

13   Boulevard.

14   A.  That's correct.

15   Q.  Do you personally have knowledge of what a Chabad is and

16   who it serves?

17   A.  The Chabad is a center for Jewish educational programming.

18   It has a synagogue for Shabbat which is part of the Jewish

19   faith, and it holds other Jewish religious services.  It is

20   housed in real property located at that address.  It is a

21   brick and mortar building.  Out front there is a menorrhea,

22   which is a Jewish symbol, and on the front of the building is

23   a canvas sign which indicates "Shabbat of Pittsburgh."

24        THE COURT:  Excuse me, counsel.  Is there a reason

25   why the three persons standing in the back of the gallery

1    can't sit in the first pew?

2            THE MARSHAL:  Typically that was for counsel unless

3    you authorize it.  If you want them seated.

4            THE COURT:  Sure.  If there is no more available

5    space, I do authorize they can sit on the first bench.  The

6    government may proceed.

7    Q.  Detective Derbish, you described the structure itself in

8    this affidavit that is Government's Exhibit No. 1.  If you

9    could please turn to Paragraph No. 17 where there appears to

10   be a picture of the structure identified as the Chabad of

11   Squirrel Hill; is that correct?

12   A.  Yes, it is.  And there also appears to be lighting facing

13   the name of the building, which is "Shabbat of Squirrel Hill,"

14   so it is lit up at night.

15   Q.  Okay.  Did you take this photographs that appears in the

16   affidavit?

17   A.  No, I did not.

18   Q.  Was this photograph taken by members of the Pittsburgh

19   Bureau of Police after they arrived on scene following the

20   report, the incident?

21   A.  It was either taken by Pittsburgh police or supplied to

22   the Pittsburgh police from the person who made this report.

23   Q.  And the graffiti that was placed on the surface of the

24   building is reflected in this photograph; is it not?

25   A.  Yes.  The words "Jews 4 Palestine" in red spray-paint,

1    along with an inverted red triangle.

2    Q.  Let's talk a little bit about the inverted red triangle.

3    Is that a symbol that has come to be associated with Hamas and

4    their activities specifically in connection with the ongoing

5    war with Israel?

6    A.  Yes.  The inverted red triangle is a marking indicating

7    that Hamas has a target at that specific location or about a

8    specific person.

9    Q.  Now, once this report was made, I take it that -- you sort

10   of referenced a little bit, but you, in connection with the

11   CMU police, the Pitt police, and others, obtained to the

12   extent that they existed various surveillance footage.

13        Before you did that, are you aware as to whether the

14   Chabad itself had video footage in front of its property?

15   A.  It does have video, and that video was supplied to the

16   Pittsburgh police and the FBI.

17   Q.  Okay.  Have you seen that video?

18   A.  Yes, I have.

19   Q.  Let's talk a little bit about what's depicted in the

20   video, and is it the incident in question?

21   A.  Yes.

22   Q.  Why don't you describe to the Court exactly what you can

23   see and the approximate time it occurred?

24   A.  The approximate time of occurrence was 0146 a.m. and that

25   was on July 29th.  The early morning of July 29th, a vehicle

1    approaches the intersection where Chabad is located and stops.

2    A person gets out of the passenger seat and it appears the

3    driver of the vehicle -- it is a convertible -- stays inside

4    the vehicle and it is running the entire time.  The person

5    that gets out of the passenger seat is covered head to toe.

6    It appears face mask, gloves and all black clothing.  The gait

7    of that person was female, and that person spray-paints the

8    words "Jews 4 Palestine" along with the inverted red triangle

9    onto the synagogue.

10   Q.  Can you actually see the paint going onto the building, or

11   do you just see the actor moving their hand as if they are

12   spray-painting?

13   A.  I believe it is the actor moving the hand as if they are

14   spray-painting.

15   Q.  Can you see a can of spray-paint in the hand of the actor?

16   A.  I believe the can was white, yes.

17   Q.  So in addition to that video footage you obtained, correct

18   me if I'm wrong, you obtained traffic surveillance footage

19   from the City of Pittsburgh, or is that county operated?

20   A.  That is City of Pittsburgh operated.

21   Q.  Why don't you explain what traffic surveillance footage

22   is, and then we can talk about what was observed in that

23   content.

24   A.  The City of Pittsburgh operates hundreds of cameras placed

25   all over the city.  Some of those cameras are equipped with

1    license plate readers and others are stand-alone.  Most of the

2    cameras are PTZ, so the lens can zoom in and out.

3            THE COURT:  Can you repeat that.

4            THE WITNESS:  Pan Tilt Zoom, abbreviated PTZ, which

5    allows the camera to gyrate almost 360 degrees and also Zoom

6    in on objects.  And in conjunction with the City of Pittsburgh

7    capabilities, CMU police and University of Pittsburgh also

8    have similar capabilities in the area.

9    Q.  Okay.  On this particular occasion, was there some traffic

10   surveillance footage that was helpful to you in further

11   identifying in particular the vehicle in question that had

12   been at the Chabad?

13   A.  Yes.  We first observed the suspect's vehicle at

14   approximately 1:20 a.m. in the area of ███████████████,

15   which is close to Defendant Talya Lubit's residence.  We had

16   tracked that vehicle on numerous cameras, approximately five

17   City of Pittsburgh cameras, up until the point of the criminal

18   incident at 0146 a.m.

19   Q.  Okay.  In the video footage that we have just spoken

20   about, including that from the Chabad, were there detectable

21   unique characteristics about this vehicle that were

22   observable?

23   A.  Yes.  The vehicle, what's determined to be the vehicle, is

24   approximately 28 years old.  It is a BMW, and it is a

25   convertible.  The rear taillights had been changed at some

1    point.  The exhaust is loud, and we could hear that at various

2    points on video.  And the front end wheels were mismatched.

3    They were visibly different from each other, so they had been

4    changed.

5    Q.  On both sides of the car?

6    A.  Positively on the driver's side.  That's where we could

7    see.  I believe after viewing the vehicle myself, it was also

8    passenger side, so both sides.

9    Q.  Okay.  The video surveillance footage that you obtained

10   through the Carnegie Mellon police department, did that

11   provide some footage that helped to reveal the license plate

12   on the subject vehicle?

13   A.  Yes.  The vehicle had been located in the

14   Oakland/Shadyside area previously, and the license plate was

15   determined to be an Ohio license plate, and the vehicle that

16   was located matched the description of the vehicle we saw on

17   the other cameras from the night of the criminal incident.

18   Q.  That was Ohio license place JJL 9045; am I correct?

19   A.  That's correct.

20   Q.  Okay.  Did the images that you saw provided by Carnegie

21   Mellon comport with all of the other video footage you had

22   obtained thus far?

23   A.  Yes, it did.

24   Q.  Okay.  Once you had a license plate, were you and the

25   other officers and agents able to query accessible databases

1    that provide different information, Accurint and other

2    databases like that, to assist you in associating that Ohio

3    license plate to an address in the Allegheny County area?

4    A.  Yes.  The license plate, based on police database

5    searches, is registered to ██████████████████ in

6    Coraopolis.  And the owner of that vehicle, I believe, is the

7    mother of Defendant Mohamad.

8    Q.  In addition to conducting searches of those databases,

9    that is Accurint and, I guess, NCIC is also a database that

10   provides that similar kind of information?

11   A.  Yes.

12   Q.  Were you able to pull up an image of that particular

13   address, that is, ██████████████, using Google Earth

14   tools?

15   A.  Yes, I was.  And the Google image that is available for

16   ██████████████████ appears to contain the same BMW that we

17   saw and that picture, I believe, was taken in 2022, so it was

18   fairly recent.

19   Q.  So the car you're saying was actually depicted somewhere

20   in front -- where was it located with respect to the house at

21   that location?

22   A.  It was parked in the driveway.

23   Q.  At some point, you or the other agents pulled real estate

24   records as well for that particular residence to determine who

25   was living there.  Prior to having any contact with the

1    Defendant, Mr. Hamad, was there agent contact with the owner

2    or owners of that property?

3    A.  Yes, there was.  Abdalla (phonetic) Hamad is the father of

4    Defendant Mohamad Hamad.  Agent Collins and I did contact him

5    at his workplace and interviewed him.

6    Q.  Were you able to confirm that he lived at that particular

7    residence?

8    A.  We confirmed all the occupants, including Mohamad, lived

9    at the residence.

10   Q.  Mohamad being the Defendant?

11   A.  Yes.

12   Q.  Who else lived in the residence?

13   A.  Abdalla, the father, Iptasim (phonetic), the mother.

14          MR. LIPSON:  Your Honor, if I may, to the extent --

15          THE COURT:  Attorney Lipson, have you entered your

16   appearance?  I know I heard from Attorney Olaiya as well as

17   Attorney Walker --

18          MR. LIPSON:  I have been appointed by my office to

19   assist with the defense team.  In that sense, Your Honor, my

20   appearance is entered.  I just wanted to note to the extent

21   that the witness was going to state the name of a minor, that

22   the minor's initials only be used for purposes of this

23   proceeding.

24          THE COURT:  Sure.  While I have the most recent

25   printing of the criminal docket, I don't have you listed, but

1    duly noted.

2          MR. LIPSON:  Thank you, Your Honor.

3          THE WITNESS:  For these purpose, there is a

4    19-year-old female and also a juvenile female also at the

5    residence.

6    Q.  Once you and the other agents were able to identify where

7    the vehicle in question was or where the owner of the vehicle

8    in question was living, were you then able to sort of do a

9    quick search of where the actor may have purchased or acquired

10   the paint in question?

11   A.  Yes.  We did do a search for that, and that involved just

12   reaching out to various paint retailers in the area, and we

13   were able to locate sales records for a can of spray-paint and

14   it is a Rust-Oleum high-gloss paint, and the color is

15   Strawberry Fields.  It is red and purchased at Walmart in

16   Robinson.

17   Q.  Approximately how far is the Walmart in Robinson from the

18   Defendant's residence in Coraopolis?

19   A.  A couple of miles.

20   Q.  Were you and your fellow agents able to acquire video

21   footage and records from that Walmart to assist you in

22   furthering your investigation of this incident?

23   A.  Yes.  Walmart provided us video of the individual Mohamad

24   Hamad, the Defendant, arriving in a convertible, parking his

25   vehicle, walking into the Walmart store with a cell phone in

1    his hand, purchasing the paint, ringing the paint at a

2    self-checkout and then paying with his credit card with his

3    name on it and then leaving Walmart with a bag.

4            He also purchased Tastykakes with the paint.  He left

5    with the items purchased in a bag, his cell phone in his

6    pocket, and he left the Walmart.

7    Q.  You indicated it was a credit card.  Just so the record is

8    accurate, was it a debit card rather than a credit card on

9    that particular purchase?  And if you don't know, that's fine.

10   A.  I'm not sure.

11   Q.  In watching that video, were you easily able to identify

12   the car that he came in and departed in as the same car that

13   you saw at the Chabad?

14   A.  Yes.

15   Q.  And obviously in the other video footage you had already

16   acquired?

17   A.  Yes.

18   Q.  At that point, did you make an endeavor to conduct a

19   consent search of the residence?

20   A.  Yes, I did.

21   Q.  And was that attempt made -- ultimately you got search

22   warrants; is that correct?

23   A.  Yes.  During conversations with Abdalla Hamad, we obtained

24   consent and from his work, he accompanied us to his residence.

25   We went in and sat on his living room couch basically and just

1  spoke with him and requested consent for his residence -- to

2  search his residence and that consent at that time was

3  granted.

4  Q.  Does the Defendant's father speak English?

5  A.  Yes, very well.

6  Q.  Before the search was undertaken pursuant to that consent,

7  did you have contact with the Defendant Mohamad Hamad?

8  A.  Yes.

9  Q.  Did Mr. Hamad, the Defendant, provide you with the

10  necessary consent as well?

11  A.  No, he did not.  He denied consent.

12  Q.  Did he engage with his father in your presence, in the

13  presence of other agents and officers in a conversation in

14  Arabic?

15  A.  Yes.  When interacting with the agents and myself and his

16  father, primarily English was spoken.  And there was a period

17  of time where Arabic was spoken.  Obviously none of the agents

18  that were there on that day understood Arabic.

19  Q.  Did he engage in a conversation in Arabic just with his

20  father with regard to his father's consent to search?

21  A.  I believe, yes.

22        MS. OLAIYA:  I'm going to object.  I think this would

23  go to speculation.  The agent already testified that he

24  doesn't speak Arabic, so how would he know the content of the

25  conversation?

1            THE COURT:  Response?

2            MS. BLOCH:  That's why I only asked did he have a

3    conversation with his father.  After his father provided the

4    consent is another way of asking the question.

5    A.  Yes.  His father and his mother.

6    Q.  Was that conversation recorded by agents?

7    A.  Yes, it was recorded.

8    Q.  Was it fairly simultaneously provided to an Arabic

9    translator?

10   A.  Yes, it was.

11   Q.  Have you and the other agents obtained a summary of the

12   content of that brief conversation with his father?

13   A.  Yes, I have a summary only.  I don't have an official

14   transcript yet.

15   Q.  Essentially what was he saying to his father and his

16   father saying back?

17   A.  The subject asked his father to stay strong and not

18   cooperate.  He says that it is his father's right to not say

19   anything.  Mohamed told his father to shut up and ask the

20   agents to leave the house.  The subject asked his father if he

21   wants to go -- wants him to go, which in parentheses probably

22   means to get arrested.  The subject tells his father if he

23   doesn't stay strong, he, meaning the subject, may get arrested

24   and will not forgive his father.

25            The mother repeatedly says they have nothing to say.

1    And then on Minute 14 of this recording, subject tells his

2    parents that at 5:00, two agents, referencing me and Agent

3    Collins, conducted a search in the garbage, and he tells his

4    parents to ask the agents to leave.

5    Q.  Had you, in fact, conducted a garbage search at that

6    approximate time at his residence?

7    A.  Yes, we did.

8    Q.  Did you have contact with Mr. Hamad in connection with

9    that garbage search?

10   A.  Yes, we did.

11   Q.  Why don't you describe what happened that morning?

12   A.  In the early morning hours --

13            THE COURT:  When you say contact with Mr. Hamad, are

14   you referring to the father or the Defendant?

15            MS. BLOCH:  The Defendant, Your Honor.

16            THE COURT:  Thank you.

17   A.  I did have contact with the Defendant Mohamad Hamad at

18   approximately 5:00 in the morning.  That is probably about

19   accurate.  We conducted a search of the trash which was placed

20   at the curb in similar fashion to all the other trash cans in

21   the neighborhood, because it was trash night.  At some point

22   when Agent Collins was removing the trash from the curb, we

23   were confronted by the Defendant, Mohamad Hamad.  We decided

24   to have no confrontation and get into our vehicle and leave,

25   at which point he entered a vehicle of his own, a separate

1    vehicle, and began to follow us screaming for approximately 20

2    minutes.

3           During that time, I tried to safely evade where I did

4    go through stop signs, red lights trying to get away, and the

5    whole time Defendant Mohamad Hamad remained with the vehicle,

6    which he did not know, and basically was in pursuit of us.

7           For our safety, I did call 911.  I made contact with

8    Allegheny County dispatch and also Moon Township police, and

9    my belief was that Mr. Hamad was calling the police to report

10   some sort of criminal activity, and I wanted dispatch to know

11   that was actually the police.  He had not called.  There had

12   been no record, so with his persistence, we activated our

13   emergency lights and sirens and identified ourselves as

14   Federal officers or federal agents, and that was in the

15   Walmart parking lot in Robinson.

16   Q.  Did you ask Mr. Hamad to identify himself at that time or

17   provide you any information?

18   A.  Yes.  We asked him basically who are you and what are you

19   doing?  And those were questions that we already knew the

20   answer to, because we had seen his driver's license photo.

21   But there was essentially no answer provided or Mohamad Hamad

22   just refused to answer questions, stated he did not answer

23   questions.

24   Q.  So you indicated that was in the early hours of the

25   morning that you had contact with him before the search, so

1    that would have been, I think, August 6, 2024.  Am I correct
2    on that?
3    A.  Yes, I believe that's correct.
4    Q.  So there were a number of hours between that investigative
5    endeavor, the garbage pull, and when you had contact with him
6    later after talking with his father and returning to the home?
7    A.  Yes, a number of hours.
8    Q.  Okay.  When the Defendant refused to consent to the search
9    of the residence, did you and the other agents, most
10   importantly, obviously, Agent Collins, seek to have a search
11   warrant issued or rather have search warrants issued for the
12   house, the Defendant's vehicles, and his person for any
13   electronic device, cell phone in particular?
14   A.  Yes, we did apply for and were granted search warrants for
15   all of those items.
16   Q.  Okay.  So at some point later that day, those search
17   warrants were executed; correct?
18   A.  That's correct.  They were executed on the same day.
19   Q.  In connection with the execution of the search warrant,
20   did you reidentify the subject vehicle and confirm, based upon
21   observation, that it would comport with the vehicle that you
22   had seen in the various surveillance footage that you had?
23   A.  Yes.  And also prior to that, we had confirmed that the
24   vehicle was parked in his garage.  I had personally done
25   surveillance.  Thinking back about August 2nd, I observed the

1    Defendant in his driveway and the vehicle parked in the

2    garage, so when we went back for the search warrant, we did

3    not see it in the driveway and it was, in fact, still in the

4    garage.

5    Q.  Did you, as part of this search, locate a can of

6    Rust-Oleum paint in the Strawberry Fields color purchased on

7    the 28th of July?

8    A.  Yes, we did.  We found that in the residence.

9    Q.  I take it you seized that?

10   A.  We did seize it, and the SKU number, the identifying

11   number, matched that of the receipt in the inventory which

12   Walmart had on file.

13   Q.  Let's talk a little bit more about the cell phone actually

14   before we move on.  You did ultimately seize the cell phone

15   that was used by Mr. Hamad; is that correct?

16   A.  Yes, we did.

17   Q.  Did it match in color with the cell phone that you saw him

18   carrying in the Walmart video footage?

19   A.  Yes.  It had a black case, and all we could see from the

20   Walmart footage, but we knew a phone was involved there

21   because he was holding it.

22   Q.  Why don't you describe the circumstances under which you,

23   as in law enforcement, came into possession of the cell phone?

24   A.  Sure.  At the point that Agent Collins and I decided that

25   we were going to seek a search warrant, we are responsible for

1   securing the residence, and during that time, we also have to

2   accommodate reasonable requests of all the family members that

3   are present.

4          So during that time, I explained the locations we

5   would be looking at, what we would be looking for, and that

6   there were certain items that were not going to be able to

7   leave the residence, and those items included but were not

8   limited to the vehicle, any cell phones belonging to

9   Mr. Hamad, any spray-paint, clothing, anything that we would

10  consider evidence.

11         Once we secured the residence, we were not going to

12  allow the occupants to move it, manipulate it or take it away

13  out of fear that the evidence would be destroyed at that

14  point.

15  Q.  Okay.  So during that time, that is, before you actually

16  had the warrants in hand for execution, did Mr. Hamad engage

17  in a conversation with his mother about his cell phone?

18  A.  Yes.  There was a conversation in Arabic, and I understood

19  one word of that conversation, and the word was "telephone."

20  So we were all essentially seated in the living room, and

21  during this conversation, I heard the word "telephone," at

22  which point the Defendant's mother walked upstairs.  And we

23  gave wide latitude to the occupants because we know that we

24  are extremely inconveniencing them, so we allowed them to walk

25  around.  We allowed them to use the bathroom, obtain water.  I

1    believe his mom started cooking a meal, so we allowed the

2    occupants to kind of freely move with the understanding that

3    certain things would not happen.  Mohamad's mom returned from

4    the upstairs with a phone in her hand, and it had a black case

5    on it, and reached in front of me to hand it to Mohamad, at

6    which point I said, "Like, we talked about this.  We are not

7    going to remove the phone.  We are not going to manipulate the

8    phone.  We are going to set the phone on the table," so that's

9    what I did.  I set the phone on the table.

10   Q.  Was it Mr. Hamad that asked his mother -- was it he who

11   used the word "telephone"?

12   A.  Yes, it was.

13   Q.  Thank you.  There was some particular clothing that you

14   seized from the residence.  Most importantly for purposes of

15   today was a sweatshirt that is photographed in this --

16   depicted in Government's Exhibit No. 1; correct?

17   A.  Yes, we did seize a sweatshirt.

18   Q.  Let's turn to Paragraph 32 of Government's Exhibit 1.

19   These are obviously close-up photographs.  Is this the front

20   and the back depicted of that particular sweatshirt we are

21   speaking about?

22   A.  Yes.  That's the sweatshirt that we seized.

23   Q.  If you could just describe exactly what is depicted on

24   both the front and back.

25   A.  Yes.  This sweatshirt was seized from the Defendant's

1    bedroom.  The front and back are similar.  They depict the

2    words, "Respect Existence or Expect Resistance."  There is a

3    masked individual with a headband depicted holding a firearm

4    along with a red upside down triangle, and that's the large

5    image on the back, with a similar but smaller image on the

6    front.

7    Q.  Does the individual with the machine gun that's depicted

8    appear as a Hamas fighter?

9    A.  Yes.

10    Q.  I take it that inverted symbol, again, is that connected

11    with the Hamas effort at least in this particular war?

12    A.  That symbol is used in a lot of Hamas productions,

13    propaganda videos.

14    Q.  Okay.  Once the search was conducted and the cell phone

15    was seized, there was some forensic analysis immediately, not

16    on site, but immediately undertaken by the FBI to determine

17    whether there was valuable information in the content of the

18    phone; is that correct?

19    A.  Yes; that's correct.

20    Q.  A number of things were discovered and are set forth in

21    this affidavit, are they not?

22    A.  Yes.

23    Q.  There is a long list of various pieces of evidence that

24    you acquired from that cell phone, so let's just start first

25    with was there contained within the cell phone a Google Map

1   search history that pertained specifically to this

2   investigation?

3   A.  Yes.  The search history within Google Maps included the

4   term "Chabad," "Chabad of Squirrel Hill," "Chabad Young

5   Professionals Pittsburgh," "Chabad Young," "Chabad Lubavitch

6   of Western Pennsylvania," and the address ███████████████,

7   which is the co-Defendant's address at that time.

8   Q.  At that time, as of July 29, 2024?

9   A.  Yes, that's correct.

10  Q.  Was there contact information for Mr. Hamad's

11  co-Defendant, Talya Lubit?

12  A.  Yes.  There was contact information by name and phone

13  number, and there was also contact information listed within

14  the Signal app.

15  Q.  Let's talk just for a minute about the Signal app.  What

16  is Signal, if you can describe what Signal is, what kind of

17  application it is and what services it provides?

18  A.  Signal is a downloadable app available on the App Store of

19  all major cell phone companies.  It is a messaging and

20  telephone service which offers end-to-end encryption.  The

21  company Signal guarantees that the contents of messages cannot

22  be intercepted, and that's why it has become so popular.  It

23  offers telephone services, messaging services, group messaging

24  services, video chats, and it allows the ability to change

25  your name within the Signal device.

1              It also allows you to set messages to disappear at

2    certain intervals, anywhere from one minute to several years,

3    and the device is pass code protected within the app.  There

4    is a pass code to get into the Signal app.

5    Q.  So if the communications are encrypted end-to-end when

6    using the Signal app, are there still ways that forensically

7    you can capture some contents or communications between Signal

8    users?

9    A.  Yes.  The FBI and the police have various methods of

10   gaining Signal data.

11   Q.  In this particular case, was some of the Signal data

12   between -- I should say rather was there Signal communications

13   within the app between the two Defendants?

14   A.  Yes, there was.

15   Q.  And for purposes of Ms. Lubit's use of the Signal app,

16   what was her username?

17   A.  Her username was Warsaw, W-A-R-S-A-W.  I know that that is

18   the case because within the Signal chat, you have the ability

19   to change your name, and the application has an audit trail of

20   name changes, so on the day that her name went from Talya

21   Lubit to Warsaw, Signal made note of that, and we were able to

22   see that.

23   Q.  I would like to direct your attention specifically to an

24   exchange between the two Defendants on or about June 1, 2024.

25   During that conversation, were the only participants the two

1    Defendants, Mr. Hamad and Ms. Lubit?

2    A.  For this particular chat, yes.

3    Q.  You indicated that within the Signal application, you can

4    create group chats as well.  Can you create a screen name or

5    rather a screen image that all of the chat members see when

6    they are chatting with one another?

7    A.  Yes.  It is the equivalent of a cover photo or cover page,

8    and you can set that as part of your group chat so that any

9    person in the chat can see that photo as the cover photo.

10   Q.  All right.  Let's talk a little bit about the conversation

11   that the two engaged in on June 1st.  If you could look to

12   Subparagraph C of Paragraph 34 of Government's Exhibit 1, if

13   you could please read the quoted information there.

14   A.  Yes.  For context, the Defendant Hamad is communicating

15   with Defendant Lubit, and states, "My ultimate goal in life is

16   Shaheed.  Everything else doesn't matter nearly as much, for

17   me you are Jewish, so that is more than allowed for me."  "My

18   goal sets are very different from the average person."  "I

19   don't see myself living long," and separately quoted, "For me,

20   it is really hard to think long term."

21   Q.  Continue, please.

22   A.  Also for context, Defendant Lubit references previous

23   conversations with Mohamad regarding marriage and having

24   children before Mohamad states, "It was a feeling of I could

25   really see myself doing that in life," "But my heart yearns

1    for being with my brothers overseas."  At the conclusion of

2    the conversation, Lubit states, "It's fine.  You're doing an

3    honorable thing."

4    Q.  Let's talk for just a moment about your understanding of

5    the term "Shaheed."  That is a term used in the Islamic faith;

6    is that correct?

7    A.  Yes.  It is a term used for martyr.

8    Q.  And a martyr is someone who dies for their faith?

9    A.  Yes; that's correct.

10   Q.  Next to the conversation we've just reviewed, there were

11   email records of various purchases set forth and described at

12   some detail in Subsection D of the same paragraph.  I would

13   like to speak a little bit about that.  There were online

14   purchases -- correct me if I'm wrong -- on June 10, 2024 of

15   certain explosive powders.  If you could please provide some

16   detail regarding those purchase records and information that

17   you have acquired in the course of your investigation from

18   persons that are knowledgeable regarding explosive powders, to

19   speak to those records?

20   A.  Sure.

21          MS. OLAIYA:  Your Honor, at this time, I would object

22   to this line of questioning.  It goes outside of the actual

23   charges that are at issue for this case.

24          MS. BLOCH:  Your Honor, the government is offering

25   this testimony in part in support of the current conditions

1    imposed by the Court for the Defendant's release, so in that

2    context, it is certainly relevant, and I think it also sort of

3    speaks to Defendant Mohamad's continuing relationship with

4    endeavors involving Hamas.

5           THE COURT:  Objection overruled.  You may continue.

6    A.  So on June 10, 2024, there was a purchase of 2 pounds of

7    Indian black powder, black aluminum powder from Pyro Chem

8    Source, which is a store, and also 2 pounds of potassium

9    perchlorate from PyroCreations.  The online purchases were

10   made using the name Chris Petrenko, which is an alias for

11   Hamad, the Defendant.  According to the purchase records, the

12   explosives were each delivered to the residence of ████

13   █████████████████ in Coraopolis, the Defendant's residence.

14   And according to PubChem, which is a database available for

15   information, potassium perchlorate will form an exclusive

16   mixture when combined with certain combustible materials such

17   as Indian black aluminum powder.

18   Q.  The phone number that was used to make this purchase

19   associated with the alias name, was that the Defendant's real

20   phone number?

21   A.  No, it was not.  That number was a voice over IP, and we

22   were not able to determine if that number existed anywhere.

23   Q.  Okay.

24          THE COURT:  Excuse me one second.  The phone number

25   was associated with what IP?

 1          THE WITNESS:  Voice over IP.  It is abbreviated VOIP.
 2     Q.  What does that mean?
 3     A.  That's usually an Internet calling service or an Internet
 4     only device that's not directly attributed to a specific
 5     device or a specific company such as Verizon or AT&T.  It is
 6     usually an online available phone number.
 7          THE COURT:  Can it be traced back to a particular
 8     individual or residence or anything like that?
 9          THE WITNESS:  Sometimes it can, and it really depends
10     on which voice over IP service is used.  Some of those
11     services operate outside of the reach of the United States
12     government, and at that point, we sometimes never find out who
13     it belongs to, what phone number.
14     Q.  All right.  Let's talk a little bit -- have you inquired
15     of any experts in the field of explosives with the FBI or
16     outside the FBI to have a better understanding of how much 2
17     pounds of each of these explosive powders really is?
18     A.  Yes.  And in a sense that 2 pounds employed criminally
19     would be extremely dangerous to persons or property, once
20     again, if employed criminally.
21     Q.  Maybe we will take it a little further in terms of some
22     content in this, the Signal messaging application.  There were
23     conversations -- strike that actually.  Were there
24     conversations between Mr. Hamad and others involving creating
25     combustible explosives, undertaking to do that, engaging in a

1    practice round and video footage of a practice round?

2    A.  Yes.  We found conversations and also video of the

3    practice round, and that conversation occurred --

4         MS. OLAIYA:  I'd like to note an objection for the

5    record.  The detective is reading from a report.  If there is

6    a report that he is reading from during his examination, we

7    would be entitled to a copy of that.

8    Q.  Are you reading from Government's Exhibit 1?

9    A.  Yes.  Exhibit No. 1 is sitting right here.  I have my own

10   copy of it.

11        THE COURT:  Objection sustained.  Overruled.  My

12   apologies.  Considering the fact that the exhibit he is

13   reading from happens to be Exhibit A, which has already been

14   admitted in evidence.

15   Q.  All right.  Let's turn to Subparagraph E of Paragraph 34.

16   I believe Subparagraph E speaks to the conversation you're

17   referring to.

18   A.  Yes.

19   Q.  Did you find or locate within the Signal app a

20   conversation or ongoing conversation between Mr. Hamad and

21   another individual, identified in this affidavit as Individual

22   No. 1, occurring between June 29, 2024 and July 7, 2024,

23   speaking about the explosives?

24   A.  Yes.  In that conversation, Defendant Hamad and an

25   individual who is known as No. 1 in this affidavit made plans

1    to practice lighting "a big shell" on or about the date of

2    July 6, 2024 as a practice run for a future explosion.

3    Q.  If you could read the content of their conversation on or

4    about June 29th.

5    A.  Yes.  Defendant Mohamad Hamad had stated:  "I kind of just

6    want to test it with you as I've never done something that big

7    LOL, and then another day very soon we can do bros ankles with

8    Talya."

9    Q.  Do you know what the phrase, "do bros ankles," means in

10   this context?

11   A.  I do not.

12   Q.  On July 7th, Mr. Hamad and that individual continue to

13   have conversations.  Did the other individuals send Mr. Hamad

14   a video of them undertaking the explosion of this test run, I

15   should say?

16   A.  Yes.  The text is:  "I keep watching the video," and then

17   Individual No. 1 sends Hamad a video clip via Signal of what

18   appears to be a detonation of an explosive device and a

19   corresponding fireball.  Defendant Mohamad Hamad responded

20   with a message, "Hell, yeah," the smiley emoji, heart emoji.

21   And we were able to take still shots of that video and make

22   them part of this Exhibit No. 1.

23   Q.  Okay.  They are depicted on the following page, that is

24   Page 13; is that correct?  Are they in sequence, meaning that

25   the top left image is the beginning of the video, and it ends

1    with the embers of the explosion burning?

2    A.  That's correct.

3    Q.  During the search that you conducted of Defendant's

4    residence on August 6th, did you find any explosive powders?

5    A.  No, we did not.  And that's part of our ongoing concern

6    for public safety is that after consultation with the bomb

7    techs, the resident bomb techs in the Pittsburgh field office,

8    the belief by those bomb techs is that a very small portion of

9    the 2 pounds of each chemical was consumed with this device

10   that's photographed and depicted here, which means that pounds

11   of this material would still be out in the world somewhere and

12   not within Defendant Mohamad Hamad's residence, because we

13   searched it and did not find it.

14   Q.  There was a lot of search, was there not, the day of this

15   arrest in connection with this Complaint?

16   A.  Yes.  Two searches did not reveal the remainder of the

17   combined 4 pounds of explosive material.

18   Q.  We sort of started the conversation with whether or not

19   you had had conversations with experts at the FBI regarding

20   that quantity.  I take it they observed this video and the

21   fire burn that stemmed from the explosion and were able to

22   make that assessment from viewing the video?

23   A.  Yes.  Their assumption was that or their assessment to me

24   was that just a very small portion of the total chemical would

25   be consumed leaving the potential for a much larger explosion

1    if the remainder of the chemicals were used or employed

2    criminally.

3    Q.  Was there also, among the Signal messages on July 12,

4    2024, an image and some communications between Mr. Hamad and

5    another individual during which he is wearing a sweatshirt,

6    the sweatshirt previously identified in the earlier paragraph

7    in Government's Exhibit 1?

8    A.  Yes, we did locate a photo.  It was taken in a place that

9    I now know because I have been there a couple times.  It is a

10   second floor bathroom of the Defendant's residence, and the

11   photo is of Mr. Mohamad Hamad wearing a green headband bearing

12   the Hamas logo, dark jeans and a black hooded sweatshirt with

13   the words "Respect Existence or Expect Resistance."  This is

14   the same sweatshirt that I described previously also bearing

15   the red upside down triangle.  Mr. Hamad is holding a flag and

16   it appears to be half United States and half Israel.  We are

17   not able to see the words on the flag, but I believe it says

18   "We stand with Israel," and the photograph is in here.

19        Also depicted in the photo is Mr. Hamad's right index

20   finger pointed upward, and this is a symbol frequently used to

21   signify Tawhid, and this is a tenet of the Islam asserting

22   one's oneness with Allah.  The same pointing in the air has

23   been featured in propaganda from a number of foreign

24   designated terrorist organizations.

25   Q.  And he's engaging in conversation with the photograph.

 1    I'm looking specifically at Government's Exhibit 1, Paragraph

 2    34F?

 3    A.  Yes.  In a chat string on July 12, 2024, Defendant Hamad

 4    claimed that he "yoinked that shit," which I understand to

 5    mean stole or took, adding that "We don't play."  The

 6    individual responded, "Pull up looking like that," Defendant

 7    Hamad replied, "I really did LMAO," which is short for laugh

 8    my ass off.  Further quoted, "imagine the terror they saw if

 9    they had cams.  Hamas operative ripping off their flags in

10    white suburbia."

11    Q.  You conducted some further investigation to determine

12    whether or not there was any other activity ongoing related to

13    protests and other things on July 12, 2024; is that correct?

14    A.  Yes, it is.  And it is also referenced in further

15    conversations within the chat that there was a protest at the

16    Pitt chancellor's residence on July 12th which coincided with

17    and -- not coincided.  And there was mention of the Pitt

18    chancellor's residence or being across from the Pitt

19    chancellor's residence within the cell phone data.

20    Q.  So if I understand you correctly, there was conversation

21    between Mr. Hamad and another individual in a Signal chat

22    session during which he speaks about being across from the

23    chancellor's residence and you confirmed separately that there

24    was, in fact, a protest there on that date?

25    A.  Yes, there was.  That's correct.

1   Q.  Subsection G of the same paragraph depicts a conversation

2   between Ms. Lubit and the Defendant.  If you could speak a

3   little bit to this conversation.  Was this messaging -- or was

4   this message notifications that were observable during the

5   forensic analysis of the contents of the phone?

6   A.  The messaging from Defendant Lubit on July 28th was in a

7   group chat of which Defendant Hamad was also a part of.

8   During that time, Defendant Lubit uses the name Warsaw, and is

9   attempting to establish a photo for the group and to make that

10  photo as part of the cover page for the group.  And I think

11  the context is "Should this be the photo," and the photo

12  depicts a person leaning out of a window holding some sort of

13  military style rifle.

14  Q.  In this particular chat, you can only see the statements

15  being made by Warsaw; is that correct?

16  A.  That's correct.

17  Q.  On the second page, a continuation of that chat session,

18  on 7/28, and just for clarity purposes, this is the day before

19  the vandalism incident at the Chabad?

20  A.  That's correct.

21  Q.  Warsaw has two other comments with content.  If you could

22  just read those into the record, please.

23  A.  Username Warsaw sends message, "Fuck Zionists," and then

24  also "Facts," and the "Facts" is accompanied by an Israeli

25  flag with the star of David, the central symbol, removed and

1   it is replaced by the Nazi swastika capriciously.

2   Q.  In addition to this group chat, you recovered -- correct

3   me if I'm wrong -- singular conversations of Signal messaging

4   between Mr. Hamad and Ms. Lubit?

5   A.  That's correct.  That conversation began approximately

6   July 27th and went through and after the criminal incident.

7   Q.  I know this is kind of long, but it is important to the

8   offenses charged, so I'm going to ask you if Subparagraph H

9   accurately depicts the conversations or the messaging

10  conversation between them, or rather it is all from Warsaw; is

11  that correct?  You picked up?

12  A.  Yeah.  It is from Defendant Lubit to Defendant Hamad.

13  Q.  But we don't see in this test chart what Mr. Hamad is

14  saying back to her?

15  A.  No.  We don't see that in this chart.

16  Q.  If you could please just read into the record what she is

17  saying so that we understand the flow of the conversation

18  shortly before the incident.

19  A.  Yes.  In chronological order, with the date of July 27,

20  2024, 9:25 p.m., just in chronological order:  "If I join you

21  in doing graffiti on this building, it matters to me that it

22  is done in good taste.  But any bank or anything else that's

23  not a religious institution, I'm happy to trash."

24          Next message:  "I wish I knew how to paint damn."

25          Next message:  "We only have one shot cuz" -- spelled

*DETECTIVE DAVID DERBISH - DIRECT BY MS. BLOCH*          43

1   C-U-Z.  "After that they will have much higher surveillance.

2   I think it's wise for them to see other buildings like PNC and

3   stuff getting trashed first.  So they are not like "You're

4   targeting the Jews."

5        Next message:  "If we target Jewish institutions

6   before Zionist non Jewish ones I think they will see it as a

7   Jew V other thing."

8        Next message:  "But I think I'm bad at art.  What if

9   I enlist," and there are initials that are omitted.

10       Next message:  "Actually there's a lot of places I

11  could do this.  There's a lot of Jewish institutions around."

12       Next message:  "Oh, fuck it."

13       Next message:  "I'll do it."

14       Next message:  "The thing."

15       Next message:  "Decorating Chabad."

16       Next message:  "Trying to make it ugly and obnoxious

17  feels like borderline desecration of religious place."

18       Next message:  "Like right before the line."

19       Next message:  "They usually use buildings for

20  synagogues.  Idk" -- which is short for I don't know -- "why

21  they use their own spaces."  "Idk if its a funding thing or a

22  lack of people thing."

23       Next message:  "They probs use that space as their

24  prayer space even though it's not fancy at all."

25       Next message:  "Hence why I said the art needs to not

1    look like it's an attempt to vandalize."

2          Next message:  "Why can't it be blue spray paint."

3          Next message:  "I'll do it."

4          Next message:  "Spray paint it is."

5          Next message:  "How far you from Walmart."

6          Next message:  "I can literally feel myself starting

7    to see Jews as my enemies."

8          Next message:  "Well, the vandalism part is the part

9    I'm most fearful of.  I mean, I guess I can just watch a

10   documentary about Gaza & read some stuff and wait.  I want to

11   feel supported in this stuff and not like, I'm gonna let

12   everyone down if I do it wrong."

13         Next message, going into July 28, 2024, in

14   chronological order, starting at 11:40 p.m., still Defendant

15   Lubit messaging Defendant Hamad:  "Scares me that I want

16   revenge.  I can feel it.  Like, I'm ANGRY," and "angry" is in

17   all caps.  "I'm so tired of feeling like being Jewish means I

18   have to second guess being anti oppression.  I will not

19   survive being Jewish if I don't learn to get past that.  I'll

20   just end up abandoning it."

21         Next message:  "I'd ask Nat for paint but then

22   someone would know I was up to something."

23         Next message:  "I am in the danger zone doing that."

24         Next message:  "I'm tired of the voice in my head,

25   telling me that a Jew would not go with the oppressed."

1          Next message:  "Every day I think, 'I don't want to
2     be Jewish any more.'"
3          Next message:  "This feels kind of like a last ditch
4     attempt at staying Jewish."
5          Next message:  "Actually you've given me hope."
6          Next message:  "So you might need to keep me in check
7     today."
8          Next message:  "Or don't."
9          And that conversation string ends July 28, 2024 at
10    approximately 11:46 p.m.
11    Q.  If you could just remind the Court the approximate time
12    that the surveillance video footage and license plate
13    information put Mr. Hamad at Ms. Lubit's residence on the 29th
14    before the vandalism took place?
15    A.  The text conversation ends roughly 34 minutes before I'm
16    able to see Defendant Mohamad Hamad's car on video in the area
17    of approximately a block away from █████████████████ on
18    camera.
19    Q.  During the time --
20          THE COURT:  My apologies.  Will you remind the Court
21    the time that the vehicle, the BMW vehicle, arrived at
22    Ms. Lubit's residence on the 29th.  It was 1 something.
23          THE WITNESS:  It was approximately 0120 a.m.
24          THE COURT:  Thank you.
25    A.  And that arrival is -- we don't have camera of the vehicle

1    driving in front, but we have camera within the vicinity.

2    I'll estimate it about a block-and-a-half away.

3    Q.  Then correct me if I'm wrong, the video footage placed the

4    vehicle in front of the Chabad at 1:49, I believe,

5    approximately 25 minutes after that?

6    A.  I have 0146 hours.

7    Q.  Excuse me.  I apologize.

8    A.  That may have a very slight discrepancy, because many

9    times DVRs, the devices that hold video, are set by humans, so

10   it is very common to have a minute or two difference among all

11   of the camera systems.

12   Q.  Once you acquired the content of what we have been

13   discussing at some length from Mr. Hamad's cell phone, you and

14   the other agents sought search warrants for Ms. Lubit's

15   residence, is that correct, as well as her person and

16   electronic devices?

17   A.  Yes; that's correct.

18   Q.  And correct me if I'm wrong, those search warrants were

19   executed on September 13, 2024; is that correct?

20   A.  Yes.  September -- give me one second.

21   Q.  I think it is described in Paragraph 37.

22   A.  37.  September 13th.  Yes, you're correct.

23   Q.  Had Ms. Lubit moved from the residence on Melwood to a new

24   residence by that time?

25   A.  Yes.  We had spoken with the Sterling Land Company, which

1    is the owner and operator of 245 Melwood Avenue, the building,

2    and we received information that Defendant Lubit had moved to

3    a new location which was at ██████████████ within

4    Pittsburgh, PA.

5    Q.  When you executed the search, was Ms. Lubit at home?

6    A.  Yes.

7    Q.  Was her cell phone at some point located and taken into

8    custody?

9    A.  Yes, it was.  It was cell phone, laptop, and other things

10   not listed within this bulletin point, but a cell phone and

11   laptop.

12   Q.  Was it Special Agent Brian Collins who, in fact, took

13   possession of the cell phone?

14   A.  Yes, he did.

15   Q.  Did he make an endeavor at some point shortly after

16   seizing the phone to place it into airplane mode to preserve

17   evidence?

18   A.  Yes.  We placed it in airplane mode to prevent

19   unauthorized access via Wi-Fi or outside intrusions so the

20   data cannot be lost.

21   Q.  Do you know from speaking with him or being present at the

22   scene whether he had difficulty getting the phone into

23   airplane mode?

24   A.  Yes, he did.  The phone had many cracks on the screen

25   which made it difficult, and at some point Agent Collins was

1     holding the phone and Ms. Lubit attempted to take it from him,

2     making like a quick grabbing action, at which time Agent

3     Collins basically said no and retained the phone in his grasp

4     and was able to put it on airplane mode.

5     Q.  Ultimately that cell phone and the computer were at least

6     or are in process of full forensic evaluation, but there was

7     some content obtained from it depicting conversations I

8     believe using Signal as well, maybe in that application,

9     communications between Ms. Lubit and others in and around

10    September 10th through September 11, 2024 reflected in

11    Subparagraph B of Paragraph 38 of Government's Exhibit 1?

12    A.  Yes.  We observed based on the audit trail and the date of

13    recovery that on August 7, 2024, which was a day after the

14    execution of the search of Defendant Hamad's residence, that

15    the phone possessed by Defendant Lubit had been factory reset,

16    essentially erasing all data prior to that date, and then

17    after that factory reset, numerous text messages were located

18    on the Signal app and the content of those text messages I'll

19    read similarly to how I did the previous one.

20    Q.  Before you do that, just so the record is clear, the reset

21    of the entire content of the phone was done on what date?

22    A.  That was August 7, 2024, one day after the execution of

23    the search at Hamad's residence.

24    Q.  Thank you.  You may go ahead.

25    A.  The content of these messages between September 10, 2024

1    and September 11, 2024:  "I had to disappear for a bit cuz of

2    legal stuff.  But I'm back."

3         Next message:  "I had to kind of go for a while cuz I

4    was dealing with legal stuff."

5         Next message:  "I just got this.  I'm sorry I was

6    dealing with legal issues so I had my phone reset and almost

7    nobody could text me on signal."

8         Next message:  "Then I had legal issues to deal with

9    so that sucked but it is much better now."

10        Next message:  "And I want to make a pro resistance

11   group.  I was starting to but then I had to dip cuz I was

12   dealing with serious legal issues."

13        Next message:  "Is the resistance chat still around?

14   If so can you readd me."  R-E-A-D-D is misspelled.  I had to

15   leave cuz legal issues."  And these messages were to different

16   individuals.

17   Q.  During the execution of the search of Ms. Lubit's

18   residence, were any of the subject explosive powders found?

19   A.  No, they were not, and they have yet to be found.

20        MS. BLOCH:  Give me one moment, Your Honor.

21        THE COURT:  Please.

22        MS. BLOCH:  I have no further questions.

23        THE COURT:  Thank you.  First to Attorney Olaiya, do

24   you have any cross-examination for this witness?

25        MS. OLAIYA:  Yes, Your Honor, we do.

1          THE COURT:  Proceed, please.

2          MS. OLAIYA:  I'll ask for permission to remain seated

3     just to better access my note.

4          THE COURT:  Please.

5          MS. OLAIYA:  Additionally, I would like to request

6     for a housekeeping matter, for the sake of the transcript, for

7     the addresses that were mentioned during this hearing to be

8     redacted, just to ensure safety of the accused.

9          THE COURT:  Any objection on behalf of the

10    government?

11         MS. BLOCH:  No objection.

12         THE COURT:  Okay.  They will be redacted.

13         MS. OLAIYA:  Thank you, Your Honor.

14                        **CROSS-EXAMINATION**

15    BY MS. OLAIYA:

16    Q.  Good morning, Detective Derbish.  My name is Yemi Olaiya.

17    I'm going to be asking you a few questions, but if you need me

18    to clarify anything, just let me know, okay?

19    A.  Yes.

20    Q.  All right.  Can you clarify exactly when were you assigned

21    to this case?

22    A.  I would have been notified of the case probably by email

23    to my unit, an email group within the intelligence unit, and

24    we circulate information on a daily basis.  So I would say the

25    morning that the graffiti was discovered, I probably received

1    an email, but my involvement probably started August 1st or

2    2nd, so maybe a day later or a day afterwards.

3    Q.  Okay.  Now, when you say your involvement, do you mean the

4    actual investigation, execution of search warrants, the full

5    inclusion of what would be entailed in a typical police

6    investigation?

7    A.  Yes.  So I work jointly with the FBI and the Pittsburgh

8    police.  I investigate federal crimes and also state crimes.

9    And I wear that hat sometimes at the same time, both hats at

10   the same time.  So when I receive information that may be a

11   federal crime, I'll pass it to the FBI, and I will join the

12   FBI within that investigation.  For that investigation, I was

13   present during trash pull, various points of surveillance, and

14   the execution of two search warrants at Defendant Mohamad

15   Hamad's house.

16   Q.  Okay.  Now, for the surveillance, there was surveillance

17   outside of the Chabad; correct?

18   A.  Surveillance video, yes.

19   Q.  But there was not any outside of the Jewish Federation?

20   A.  Not that I'm aware of.  If I didn't already mention the

21   Jewish Federation, it was also spray-painted at about the same

22   time and that spray-paint depicted the text, an arrow

23   underneath the words "Jewish Federation" with the words in red

24   spray-paint "Funds genocide, heart Jews, hate Zions," and that

25   was also reported to the Pittsburgh police at about the same

 1    time, the same morning.

 2    Q.  Is this the picture that you're referring to, Government's

 3    Exhibit 1 under Paragraph 19?

 4    A.  Yes, it is.

 5    Q.  Okay.  So there is a sign that says "Jewish Federation"

 6    and then a red arrow; correct?

 7    A.  Yes.

 8    Q.  And that red arrow says "Funds genocide"?

 9    A.  Yes.

10    Q.  So that would mean Jewish Federation funds genocide?

11    A.  Yes.

12    Q.  Okay.  And then there's a second line that says "heart" or

13    "love Jews, hate Zions"; is that correct?

14    A.  Yes.

15    Q.  Now, how many incidents have you gathered surveillance on?

16    You mentioned CMU police, Pitt police, how many in total?

17    A.  City of Pittsburgh police definitely.  The video from

18    Chabad, CMU police assisted with the LPR and their own video.

19    I believe that's three.

20    Q.  Were each of those videos preserved?

21    A.  As far as I know, yes.

22    Q.  You watched each of them individually yourself?

23    A.  Not in totality.  But I've watched enough to say the

24    video, at least in the City of Pittsburgh videos -- I'm sorry.

25    The vehicle in the City of Pittsburgh videos is consistent

1    with the Defendant, Mohamad Hamad's car.

2    Q.   Okay.  Now, I'm going to back up for a second.  You said

3    as far as you know, the videos have been preserved.  Was there

4    a request to preserve them?

5    A.   So for the City of Pittsburgh, I requested those ones,

6    those videos be preserved.  I can't speak for the CMU police.

7    I think it would be a logical step, but I did not make the

8    request to CMU police to do the preservation.

9    Q.   Did anybody else from your office or connected to this

10   investigation make a request to preserve that surveillance to

11   CMU?

12   A.   Like I said, it would be a logical step.  I'm not positive

13   I have that information.

14   Q.   Now, you mentioned the vehicle that was at issue in this

15   case, so I want to address some of the things that you

16   mentioned on direct.  I know that you mentioned the suspect

17   vehicle was located in Oakland.  Can you clarify a little bit

18   more about that.  When was that vehicle located in Oakland?

19   A.   On the night of the incident.

20   Q.   I'm not sure you stated on direct it was located in

21   Oakland.

22   A.   Sure.  So based on the license plate recognition, we have

23   photos -- we have still photos of the vehicle belonging to

24   Mr. Mohamad Hamad over the course of time, so even prior to

25   the criminal incident and after the criminal incident, we have

1    video or photos of the vehicle.

2    Q.  Okay.  So when was the location of the Oakland -- how does

3    that fall into the timeline of this incident?

4    A.  For speaking to license plate recognition specifically, or

5    the video itself that we have?

6    Q.  Just the significance that the vehicle was located in

7    Oakland.  What is it, since you mentioned it?

8    A.  It is very close to the location of the co-Defendant at

9    ███████████████.  It is also basically the center of

10   community life for people of the Jewish faith.  There is a

11   number of centrally-located synagogues, places of worship

12   within Shadyside/Squirrel Hill area, and that is right

13   adjacent to the Oakland neighborhood.

14   Q.  So the incident, that occurred on July 29th; correct?

15   A.  Yes, the early morning hours of July 29th.

16   Q.  And the license plate reader, all the still photos that

17   you have of the vehicle are related to the license plate

18   reader; correct?

19   A.  No.  We have video of the vehicle separately.  We also

20   have license plate recognition photos of the vehicle.  Those

21   devices can be combined, but in the case of the City of

22   Pittsburgh, those are separate things.  CMU or the University

23   of Pittsburgh will have access to different video and

24   different license plate readers than the City of Pittsburgh

25   will have.  So that's why we all talk about -- we all make

1    requests of each other to look for data, to look for evidence

2    for any number of criminal incidents.

3    Q.  Do you have surveillance and images from the license plate

4    reader from before July 29th?

5    A.  Yes.  We have photos.  We have license plate photos of the

6    vehicle prior to July 29th.

7    Q.  What is the earliest date that you have them from?

8    A.  I don't recall the earliest date.  I know that the data

9    system used for license plate recognition typically lasts

10   about six months, and the City of Pittsburgh's data system

11   lasts for ten days, so for the City of Pittsburgh, the

12   earliest I would have would be approximately July 19th.  I

13   don't know if we have that data, but that would be -- the

14   earlier time period would be ten days for the City of

15   Pittsburgh and six months for the outside agencies using a

16   different license plate system.

17   Q.  Now, actual contact, law enforcement contact with the

18   vehicles, that wasn't until the search warrants were executed?

19   A.  No.  I observed that vehicle in the garage prior to --

20   approximately a week prior to the search warrant.  If I

21   remember correctly, August 1st or August 2nd.

22   Q.  Okay.  So a couple days after the original incident?

23   A.  Yes.  After the incident, we began the investigation, and

24   once we learned that the license plate was connected locally,

25   we began driving past residences to see if we could see the

1    vehicle.  And when we did see the vehicle, I was able to

2    confirm that it looked remarkably like the vehicle in the

3    video we had.

4    Q.  Okay.  Now, the vehicle itself, who was it registered to?

5    A.  I believe it is registered under Ohio registration to

6    Iptasim Hamad, which is Defendant Hamad's mother.

7    Q.  Okay.  And the license plate, what name, if any, is that

8    connected to?

9    A.  The residence at -- just give me one second.  I can find

10   that for you.  I don't have that information in this

11   affidavit, but there was a connection between the owner, the

12   residence and the vehicle, and also Mohamad Hamad's driver's

13   license, which all list the same address.

14   Q.  Now, in Paragraph 27 in Government's Exhibit 1, it

15   mentions that there was an Accurint run done on the vehicle

16   and it was understood to be associated with an Ohio address.

17   A.  Yes.  I see that.

18   Q.  So who is living or owns that Ohio address that the car

19   was also connected to?

20   A.  I don't have that information.

21   Q.  So it is another unidentified person thus far?

22   A.  The third party referenced I believe is Mohamad Hamad's

23   mother, and the address I believe was a prior address.  The

24   family had lived there in the past, but was currently residing

25   at █████████████████████.

1   Q.  Is that what the Accurint revealed?

2   A.  I don't have the full report.  Just going from memory, I

3   think that's accurate.

4   Q.  Can you confirm where is the vehicle now?  Is it still in

5   the custody of law enforcement?

6   A.  I believe the vehicle is -- the last known location of the

7   vehicle was the location of the arrest.  No.  I'm sorry.  I

8   believe it is in his garage.  I believe it is in the garage of

9   ███████████████████.  That was the last place I know it

10  was.

11  Q.  So it was only searched from -- the search warrants were

12  executed.  It wasn't seized or taken away, moved away from the

13  property?

14  A.  No.  We had no reason to remove the vehicle.  We were able

15  to search it, and we left it in place.

16  Q.  Okay.  Just to clarify, so for Paragraph 27 when it says

17  that the vehicle is registered to a third party in Dayton,

18  Ohio, there is another mention of an Ohio address.  Is that

19  the same address, or are there two different addresses being

20  referenced in this paragraph with regards to Ohio?

21  A.  I believe the only Ohio address referenced 1416 Robinhood

22  Drive, and that is the Ohio license plate registration

23  address.  After reading this further, Accurint, the database,

24  associates the address ████████████████ with this

25  vehicle by license plate.

1   Q.  Okay.  Now, you did two searches on the home; correct?

2   A.  Yes.  Two searches on ████████████████████.

3   Q.  You were present for both of them?

4   A.  Yes, I was.

5   Q.  Okay.  So for the first search, what time of the day did

6   you first arrive at the house?

7   A.  I would have to go back and look at the logs for the start

8   and end.  I would have to say before lunch, we arrived, and we

9   were there approximately seven hours for the first search.

10  Q.  Excuse me.  This was the August 1, 2024 date; correct?

11  A.  Yes.

12  Q.  Okay.  Were you present --

13  A.  Wait, I'm sorry.  What date did you reference?

14  Q.  August 1st.

15  A.  I believe it was August 6th.

16  Q.  Okay.  Thank you.  Now, did you or other officers have

17  body-worn cameras during the search of the home?

18  A.  I don't believe so.

19  Q.  What about during any other interactions while you were at

20  the home?

21  A.  There may be some body-worn camera.  I wasn't wearing one,

22  and at certain times the FBI prohibits us from wearing

23  body-worn cameras unless we have a planned event.  And in this

24  instance, this warrant was unplanned.

25  Q.  What was the mechanism that was used to record the

1    conversation that you mentioned on direct?

2    A.  I don't know.  I did not see a recorder activated.  I

3    don't know what mechanism we recorded.

4    Q.  But it was another agent that works with you?

5    A.  Yes, Agent Collins.

6    Q.  Okay.  Do you know if that recording has been preserved?

7    A.  I believe it has been preserved, and we are currently

8    awaiting the transcript from a contractor.

9    Q.  Are there other recorded conversations in relation to this

10   investigation?

11   A.  Unless other officers were wearing cameras, I don't know.

12   I don't believe so.

13   Q.  I mean outside of the search as well, too?

14   A.  Yes.  Unless, like, for example, I called 911 to assist

15   Abdalla Hamad, who was having a medical issue, and a Moon

16   Township police officer arrived on scene, so that officer may

17   have a body camera.  There were a number of officers and a

18   number of agencies that did assist in both searches.  So they

19   may have body camera footage.

20   Q.  Not just body-cam; any other type of recording of

21   conversations?

22   A.  Could you give me an example?

23   Q.  Sure.  Like you're talking to somebody perhaps in relation

24   to this case.  Were conversations like that recorded?

25   A.  I do not have any recording devices.

1    Q.  Or any other law enforcement working on this case?

2    A.  If it wasn't the one recording that we mentioned by Agent

3    Collins or any separate Agency's body camera, then I'm not

4    aware of it.

5    Q.  Okay.  For a second I want to go back to the LPR video,

6    please, or surveillance and the images that they captured.  So

7    when the plates are ran, there is information that also

8    becomes available whenever law enforcement runs that

9    information?

10    A.  So the license plate recognition cameras only document

11    time, date, location and photographs of the vehicles involved.

12    And those are categorized a number of ways.  And they are

13    searchable according to state, color, model of the vehicle,

14    various -- or date and time.

15    Q.  Right.  So when you searched the information, did you

16    search the information that's connected to that specific

17    license plate?

18    A.  I searched for prior City of Pittsburgh LPR, and I recall

19    that there was some -- within the last ten days, there was

20    activity.  For the purposes of this, I believe the CMU police

21    used access to LPR that they have.

22    Q.  So LPR, aside from the actual license plate, you didn't do

23    any further investigation into that specifically?

24    A.  I'm not sure if I understand that question.

25    Q.  Sure.  So when law enforcement runs a license plate, it

1    can come up with an individual, for example, who is connected
2    to it.  Did you do that in this case?
3    A.  I personally did not.  I have the Accurint and NCIC
4    database.  I see these were queried.  I did not do that
5    personally.
6    Q.  Okay.  Did you follow up on what those queries were, what
7    information was gathered from those queries?
8    A.  No, I didn't, but in talking with Abdalla Hamad, Defendant
9    Hamad's father, he did say that his son drives that BMW.
10    Q.  Okay.  So you don't know whether or not there are
11    particular individuals who were connected to that particular
12    license plate number?
13    A.  Yes.  The only person we have been able to confirm driving
14    the vehicle is the Defendant.
15    Q.  Excuse me.  During the queries of the license plate
16    itself?
17    A.  During a query, we were able to get the owner's
18    information that is maintained by the state of Ohio.  The
19    Defendant has a number of traffic tickets.  I can go back to
20    see if it was that, that vehicle, but I did not do that as of
21    yet.
22    Q.  And the surveillance that was pulled from the actual
23    evening of July 29th, were you able to positively identify
24    Mr. Hamad in any of those surveillance videos?
25    A.  No.  No.  The video is a depiction of the vehicle itself.

1    I was not able to make a positive ID from any video other than

2    the Walmart video.

3    Q.  Okay.  Going back to the house, how long were you at the

4    house before you obtained a search warrant?

5    A.  It was a couple hours.  I don't have the exact time, but

6    we had no plans of doing a search warrant that day.  But we

7    accelerated the process when we realized that we could be

8    losing evidence.  So Agent Collins departed and essentially

9    wrote the search warrant himself, swore it out and returned

10   with the search warrant before we began our search.

11   Q.  So you stayed at the house while Agent Collins retrieved

12   the search warrant?

13   A.  Yes.  We occupied the house for the entire duration.

14   Q.  You followed family members within the house throughout

15   that time?

16   A.  Loosely, yes.  Certainly not to the bathroom.  We tried to

17   be minimally invasive, even though that was very difficult,

18   but we allowed the family to participate in any activity they

19   normally would.  They were free to leave.  They were not

20   detained, and like I said before, the limitation was on

21   acquiring weapons and potentially destroying evidence.

22   Q.  Okay.  So how long were you at the house before consent

23   was --

24        MS. BLOCH:  Objection, Your Honor.  This is now

25   teetering on suppression issues that don't go to probable

1    cause.

2         MS. OLAIYA:  Your Honor, this line of questioning is

3    appropriate as government has already elicited a lot of

4    testimony in regards to the specifics of the search, that

5    consent that had to do with it, so they opened the door.  We

6    are allowed to ask questions about it on cross-examination.

7         THE COURT:  So to the government's point, I do think

8    that some of this testimony that you are eliciting kind of is

9    in the realm of discovery a little bit beyond whether or not

10   you can undermine probable cause that has been averred in the

11   Complaint and testified to today.

12        Having said that, I will overrule the objection and

13   allow you a little latitude, but I do hope everyone

14   appreciates that this is not a discovery proceeding and that

15   the examination should squarely focus on probable cause.

16        MS. OLAIYA:  Yes, Your Honor.

17   A.  The time that myself and Agent Collins were at the

18   residence before Defendant Hamad withdrew consent, I would

19   have to estimate was between 10 and 15 minutes.  We did -- and

20   I'm not even sure Defendant Hamad was aware that we were in

21   his house, because we came with his father and spoke with his

22   father and mother for some time before his father requested

23   that the Defendant come down to the first floor.

24   Q.  So the search of the phone as well, too, there was only

25   one phone or two phones that you collected in relation to the

1    search?

2    A.  There was one phone seized during each search warrant.

3    Q.  On two separate dates?

4    A.  Two separate dates, so two phones total.

5    Q.  Okay.  Now, when you first arrived at the home, you at

6    that time had confiscated the phone or at what time did the

7    phone come in your possession?

8    A.  Upon arrival at the residence, we entered with the father,

9    Abdalla Hamad.  We spoke with him for a period of time.  We

10   spoke with Mohamad's mother, and at some point after I had

11   explained all the things that we were looking for for

12   evidence, and I had explained that everyone was free to leave

13   and we were going to be obtaining a search warrant, there was

14   a conversation that I referenced earlier in Arabic between

15   Mohamad and his mother in which the word "telephone" was used.

16   That's the only word I recognized, but at the conclusion of

17   that conversation, and after we had already stated we were

18   securing the residence, Iptasim Hamad, Mohamad's mother, went

19   to the second floor unaccompanied, retrieved a black cell

20   phone and handed it in Mohamad's direction in front of me, at

21   which time I took possession of the phone and placed it on the

22   table.

23   Q.  Okay.  Did you manipulate the phone in any way?

24   A.  I did not.  I just simply prevented it from any of the

25   data being destroyed.

1    Q.  So once the search warrant were obtained, how long were

2    you at the house conducting a search?

3    A.  It was a period of hours.  Once again, I would have to

4    look at the log sheet for a positive time.  Based on my

5    memory, we probably concluded around 6:00 or 7:00 p.m. if I

6    had to estimate.

7    Q.  What time did you start the search?

8    A.  It was early, before noon.  It would be an estimation.

9    10:00 maybe, or 10:30.  I started my shift at about 4:30 with

10   the trash pull and then responded.

11   Q.  I'm sorry.  4:30 a.m.?

12   A.  4:30 a.m. for the trash pull.  Went to Cranberry and

13   interviewed the father.  We traveled back from Cranberry to

14   ██████████████████, at which time we entered the residence

15   with consent to search.  And then at about that time, I would

16   have to say 10:00 to 10:30 a.m. approximately, but to be sure,

17   I would have to check the log.

18   Q.  Okay.

19   A.  The search warrant application itself took several hours.

20   Q.  Were there any other phones that you collected or placed

21   on the table while you were waiting on the search warrant?

22   A.  I don't believe so.  I remember that other occupants of

23   the residence had their phones and were able to use them.  I

24   specifically recognized the one that Mohamad was handed having

25   a black case, and that was the one I was concerned with,

1    because he had it in his possession at Walmart.  So I believed

2    that was his phone, and that's why I wanted to preserve that

3    specific phone.

4    Q.  Okay.  During your time in the house, you mentioned you

5    did follow family members and other occupants of the home at

6    that time; right?

7    A.  Yes, reasonably.  Like, for example, if someone had to go

8    to the bathroom, I just escorted the family member to the

9    bathroom and allowed them to use the bathroom privately.

10   Q.  What about prayer?  Did you prevent Mohamad from praying?

11   A.  No.  Mohamad was allowed to shower.  And I don't believe

12   it was a full shower, but he described wanting to clean

13   himself.  I allowed him to clean himself.  I allowed him to

14   use the bathroom, and I allowed him to pray in any fashion

15   that he wanted to pray.

16   Q.  While you were observing him?

17   A.  Yes.  Yes.  And that was simply because the residents and

18   the occupants were in the house, and we had not searched it.

19   We did a check for other occupants, but there was nothing that

20   was going to prevent anyone from either destroying evidence or

21   moving evidence, so yes, there was some observation.  I don't

22   believe the Defendant requested privacy, and he conducted his

23   prayers in the living room or adjacent to the living room

24   where we were all seated.

25   Q.  Now, turning to your surveillance of Mr. Hamad, so before

1    his arrest, he was being surveilled; correct?

2    A.  So the arrest was much more recent than the search

3    warrant.  Can you give me the timeframe?

4    Q.  Just before this arrest of Mohamad, there was surveillance

5    being conducted of him.

6    A.  I would say the surveillance prior to the search warrant

7    was --

8    Q.  Not the search warrant; the arrest?

9    A.  Prior to the arrest?

10   Q.  Yes.

11   A.  I was not involved in any surveillance prior to the

12   arrest.  My involvement with this case ceased at the

13   conclusion of the first search warrant.  I was asked to come

14   to the second search warrant because I had established some

15   rapport with the family, and I was able to speak with them

16   pretty easily, so hopefully a friendly face made the second

17   search warrant much easier for them.

18   Q.  So as part of your investigation, are you aware of any

19   surveillance of Mohamad before his arrest occurred?

20   A.  Yes.  It would be common practice to continue to

21   investigate, to gather clues, so I'm sure there is some sort

22   of surveillance.  I just didn't participate in it myself.

23   Q.  Now, if there was any illegal activity that had been

24   observed during that surveillance, you would have been made

25   aware of that, correct, as part of a thorough investigation?

1   A.  I believe so, yes.

2   Q.  And there was none; correct?

3   A.  I'm not aware of any other criminal incidents that the

4   Defendant is involved in.

5   Q.  Going to the incidents that you mentioned, I believe it

6   came to a halt in the Walmart parking lot, so you and your

7   partner, there was another law enforcement officer with you at

8   the time; correct?

9   A.  Yes.

10  Q.  Okay.  You were both in an unmarked car?

11  A.  That's correct.  Unmarked car equipped with red and blue

12  lights and siren.

13  Q.  But as soon as you got into that car, that unmarked

14  vehicle, the lights and sirens were not activated; correct?

15  They weren't activated until a later time.

16  A.  That's correct.

17  Q.  I want to turn to some of the photos and messages that you

18  also mentioned on your direct.  In Government's Exhibit 1,

19  Paragraph 32, there is a picture of an individual with a hood

20  holding up two flags sewn together and their faces covered;

21  correct?

22  A.  Yes.  I see that photo.

23  Q.  Okay.  You believe this to be Hamad because of the

24  background?

25          THE COURT:  I apologize.  Are we at Paragraph 32, and

1    what specifically?

2          MS. OLAIYA:  Yes, Your Honor.  Paragraph 32 on

3    Page 13.

4          THE COURT:  Thank you.

5    Q.  You believe this to be Mohamad because of the background

6    and the image, correct, the wall, the door, the surrounding

7    objects in the picture?

8    A.  Yes.  That's part of it.  I also believe it to be him

9    because we located that sweatshirt in his room.  We located

10   the headband.  The background and the pink color and the door

11   is accurate within his residence, and he also -- the chat

12   thread on July 12th where he claims he "yoinked that shit,"

13   adding, "We don't play," eventually claiming responsibility

14   for taking the flag he is holding.

15   Q.  I'm going to turn to another page within the report.  Give

16   me just a minute.  On Page 12, Subparagraph D, the name of

17   Petrenko is mentioned.  It states they believe this person to

18   be an alias for Mr. Hamad.  What information do they have to

19   support that?

20   A.  The email purchases were on the Defendant's phone, and the

21   residence where the chemicals were delivered is the residence

22   of ███████████████.  And then the information of the

23   purchase is located on his phone.

24   Q.  None of those items were ever located; correct?

25   A.  That's correct.  Yes.  The chemicals were not located.  I

1    believe that was part of the reason for the subsequent search

2    warrant, because there was potential, with the talk in the

3    text messages, of additional devices or additional explosions.

4    Q.  You can't positively confirm whether or not someone else

5    had that sent to Mr. Hamad's residence; correct?

6    A.  No, I can't.

7    Q.  Now, turning still to this page, we are going to continue

8    on to Page 13, Subparagraph E and F.  They both mention of

9    known individuals.  Who are those known individuals?

10   A.  Without additional context, such as the phone number, I

11   don't know.  Unless it is listed, both sides of the

12   conversation are listed, I'm not sure who Individual 2 is in

13   Section F.

14   Q.  But they are listed as known individuals, correct, in this

15   Complaint?

16   A.  Yes.  I believe they are known to the FBI.  They are not

17   necessarily known to me or every person who has access.

18   Q.  But they are likely known to the author of this report?

19   A.  I would believe so, because the messages occurred between

20   two people.  I'm sorry.  Yes, the author of the report being

21   Special Agent Collins.  Yes, I believe he would know.

22   Q.  Okay.  Now, I'm sorry.  Going back one more time to the

23   picture on Page 14, you made mention on direct the Shaheed.

24   So there are different definitions for this word.  Are you

25   aware of that?

1   A.  No, I'm not.

2   Q.  Okay.  So in your investigation, you didn't come across

3   the fact that it means "beloved" or "witness"?

4   A.  No, I don't have that information.

5   Q.  Okay.  Going to your background, you mentioned that you

6   are part of a special task force with the FBI that

7   specifically focuses on terrorism; correct?

8   A.  That's my assignments.  I will generally help the FBI,

9   Pittsburgh office with anything that they would need, inside

10  and outside of the City of Pittsburgh.

11  Q.  Okay.

12  A.  So I do have designated assignments.  I do work with the

13  FBI full-time.

14  Q.  Okay.  And it all encompasses terrorism in some respect;

15  correct?

16  A.  No.  If a different squad handling a drug investigation or

17  white collar crime -- if any squad asked me for help, I would

18  generally help as part of my daily duties.

19  Q.  So how long have you been doing duties that relate to

20  terrorism?

21  A.  My assignment has been about three years.

22  Q.  Okay.  And that would include having knowledge or

23  information that's both domestic and international; is that

24  fair to say?

25  A.  Yes.

1    Q.   Okay.  But you're unfamiliar with the different meaning of

2    Shaheed?

3    A.   That's correct.

4    Q.   So with Zionism, that's understood to be a national

5    ideology of Israel, or are you unfamiliar with that as well?

6    A.   Could you repeat your definition.

7    Q.   Sure.  National ideology associated with Israel?

8    A.   I believe that to be true.

9    Q.   Okay.  So it isn't necessarily a religious or -- let me

10   put it this way.  It is not an established tenet of Jewish

11   faith?

12   A.   I'm not familiar with it enough to say that it is an

13   established or it is not an established tenet of Jewish faith.

14   Q.   Now, in your work, you come across Zionists that are also

15   a part of war efforts such as the one that's currently going

16   on with the Israeli Palestinian conflict?

17   A.   I don't know that I've ever personally interacted with

18   someone like that, but --

19   Q.   Or just if you're familiar with it generally, even if you

20   don't have any personal interactions with persons such as

21   that?

22   A.   Yes.  I believe I am.

23   Q.   Okay.  There can be Christian Zionists as well.  They can

24   run across different religions; correct?

25   A.   I believe that anyone can identify with any type of

1    religion that they could choose on any given day if they like

2    to.  I think that's an individual choice.

3    Q.  I'm referring to the national ideology that can be

4    associated with varying religions, just not Judaism?

5        MS. BLOCH:  Objection.  This witness does not know

6    something like that.  He has already described his limited

7    knowledge what the term Zionism means.

8        MS. OLAIYA:  Your Honor, I'm just exploring what the

9    witness already offered on direct in their extensive

10   background with law enforcement, particularly as it relates to

11   the FBI and anti-terrorism efforts.  If he doesn't know that,

12   he can say it, but on cross-examination, I'm allowed to

13   explore what he knows or doesn't know.

14       MS. BLOCH:  I believe he said he doesn't know.

15       THE COURT:  I also believe he said he doesn't know.

16   While this objection is pending, did you testify previously

17   regarding the extent of your understanding whether or not

18   Zionists can also include Christianity faith?

19       THE WITNESS:  Yes, I believe I did.

20       THE COURT:  Attorney Olaiya, is there anything else

21   you would like to offer the Court for the Court's

22   consideration as it relates to the objection that's pending?

23       MS. OLAIYA:  No, ma'am.

24       THE COURT:  Sustained.

25   Q.  So you talked a little bit earlier on direct past

1    incidents in the Pittsburgh community, different acts of

2    vandalism, things of that nature; correct?

3    A.  Yes.

4    Q.  Aside from these two current cases, how many of those have

5    been indicted federally?

6    A.  I don't know.  I don't know if there has been any other

7    ones indicted federally.  But if we were to receive

8    information or probable cause to indict those federally, I

9    would hand it to the prosecutors and allow them to decide.

10   Q.  So besides these two, you don't know of any others, but

11   from your testimony earlier since October 7th, there have been

12   a rise in incidents against Jewish people; correct?

13   A.  That's correct.

14   Q.  In the Pittsburgh community?

15   A.  Yes.

16   Q.  Okay.  Now, I want to focus a little bit on the

17   information also that you got at some point.  So were all of

18   the messages that you collected, they were from the device

19   itself, the respective devices?

20   A.  Yes.  Any of the messages referenced here were taken from

21   the cell phones.

22   Q.  Okay.  Just wanted to clarify that point.

23            MS. OLAIYA:  If I can have one moment.

24            THE COURT:  Please.

25            MS. OLAIYA:  Thank you.

1    Q.  Now, going back to Walmart or, excuse me, the trash pull,

2    so that happened at 4:30 in the morning when you first arrived

3    to the residence on August 6th?

4    A.  I don't have the exact time of arrival at hand.  I

5    remember it was very early in the morning.

6    Q.  It was still dark outside?

7    A.  Yes.

8    Q.  Okay.  And Mr. Hamad -- or let me back up for a second.

9    At that time, you were in plainclothes?

10    A.  That's correct.

11    Q.  And this is also the same time you were driving your

12    unmarked vehicle?

13    A.  That's correct.

14    Q.  Okay.  And Mr. Hamad tried to approach you, but you and

15    your partner left in the unmarked vehicle?

16         THE COURT:  Apologies.  When you say "Mr. Hamad," are

17    you referring to the Defendant or his father?

18         MS. OLAIYA:  My client, Your Honor.

19    A.  That's correct.  We left.

20    Q.  Okay.  Now, at what point in time did you activate your

21    lights and sirens?

22    A.  After it became clear to me that the Defendant was not

23    calling the police and that he was not going to relent at

24    essentially pursuing us.  So I pulled into a well-lit area,

25    notified dispatch of what I was doing, and activated the

1    lights and then approached the Defendant in this vehicle and

2    identified myself along with my partner.

3    Q.  Okay.  So towards the end of this pursuit is when you

4    identified yourself to my client?

5    A.  Yes.  I believe that's what ended it, the interaction.

6         MS. OLAIYA:  Your Honor, at this time, I would like

7    to admit several exhibits for the purposes of the evidentiary

8    hearing portion, and I also, of course, have copies for the

9    Court and Ms. Bloch as well.

10        THE COURT:  Just to be clear, this is for the

11   evidentiary portion in this proceeding, that being the

12   preliminary examination, whether or not there is probable

13   cause.

14        MS. OLAIYA:  Correct, Your Honor.  If you would like

15   me to do it now, or I can wait until Mr. Walker has a chance

16   to ask the witness questions.

17        THE COURT:  I don't see why we would wait.  If you

18   have a copy for the Court.

19        MS. OLAIYA:  Yes, Your Honor.

20        MS. BLOCH:  Are these exhibits you're offering for

21   the witness?

22        MS. OLAIYA:  Just to clarify, it's for the

23   evidentiary hearing, not the preliminary hearing portion, so I

24   wouldn't be offering them to the witness.

25        THE COURT:  In your case-in-chief?  I'm so confused.

1    So is it in your case-in-chief that you're intending to offer

2    this and not use these for purposes of examination of the

3    witness?

4           MS. OLAIYA:  Correct.

5           THE COURT:  If you're done with your

6    cross-examination of Mr. Derbish, then we will proceed with

7    Attorney Walker.

8           MS. OLAIYA:  Thank you, Your Honor.

9           THE COURT:  Attorney Walker?

10          MR. WALKER:  No questions, Your Honor.

11          THE COURT:  Thank you.  Any redirect?

12          MS. BLOCH:  I just have a few questions, Your Honor.

13                      **REDIRECT EXAMINATION**

14   BY MS. BLOCH:

15   Q.  Just for clarification purposes, let's peek at the emailed

16   purchase records that were obtained from Mr. Hamad's phone for

17   the purchase of the 2 pounds each of the explosive powders.

18   A.  True.  Referencing Page 12, Section D?

19   Q.  Well, above that.  Actually D.

20   A.  D.  Okay.

21   Q.  So this is the first time -- this is where the affidavit

22   speaks to those email records.  Just so there is some

23   clarifications, if you know, were the emailed records directed

24   to Mr. Hamad in the name of this alias, Chris Petrenko?

25   A.  I don't recall who the records were addressed to.

1    Q.  You've testified that the records indicated that the

2    powders were delivered to his personal residence, that is,

3    Mr. Hamad's?

4    A.  That's correct.

5    Q.  After they were delivered, or purchased, I should say --

6    we don't know the delivery date, I presume?

7    A.  That's correct.  Unless it was located elsewhere on the

8    phone through some sort of delivery confirmation, I don't know

9    if we will know the delivery date.

10   Q.  Okay.  So shortly thereafter, you spoke to some Signal

11   message strings between Mr. Hamad and another individual

12   regarding using powders to create explosives and doing a test

13   run.

14   A.  That's correct, yes.

15   Q.  And that the test run was in anticipation of another

16   explosion to test whether it worked and whether it could

17   achieve certain things; is that correct?

18   A.  Yes.

19   Q.  In the context of that conversation, was there additional

20   conversations about an anticipated second or subsequent

21   explosion?

22   A.  Yes.  June 29th the quote is, "I kind of just want to test

23   it with you as I've never done something that big LOL and then

24   another day very soon we can do bros ankles."

25   Q.  Did you learn from the larger rendition of this exchange

1    there was additional discussion about the bros ankles and

2    discussion about breaking concrete?

3    A.  Yes.  Let me find that for one second.

4          THE COURT:  AUSA Bloch, will you re-ask that

5    question.  I missed parts of it.

6    Q.  You're speaking about a conversation between Mr. Hamad and

7    Individual 1 reflected in Subparagraph E of 34.  Did that

8    conversation between the two of them go beyond the content of

9    this particular paragraph?

10   A.  Yes, it did.

11   Q.  Was there any discussion between the parties that

12   addressed the bros ankles?

13   A.  Yes.  There was additional context.  After discussing this

14   "another day very soon we can do bros ankles," there was text

15   that said, "I just want to test it with you as I've never done

16   something that big," followed by, "It gives us more of a

17   chance to talk and test something fun while at the same time

18   seeing if what I made is going to be viable and work," and

19   this is with a separate individual.  And there is a quote,

20   "You think with that new crazy shells and 4 to 5 cans, we

21   could really take bros ankles," three periods, "concrete

22   blow?"  To which the Defendant replied, "We are going to have

23   to test it first and see how it holds up."  The individual

24   replied, "We gone fuck shit up with some bad bitches.  You

25   already got Brittany, already got me.  Them bad bitches going

1    to be part of it all."

2    Q.  Just for clarification, with respect to the trash pull and

3    the "pursuit" thereafter, it was the Defendant pursuing you,

4    not the reverse?

5    A.  That's correct.

6    Q.  And at some point in time you confirmed either with him or

7    did you confirm with the Moon Township police that at no time

8    did the Defendant call the police?

9    A.  I confirmed with Allegheny County dispatch who covers all

10   of Allegheny County, and then separately Moon Township police

11   have their own dispatch because we had potentially crossed

12   multiple jurisdictions driving around, and there were no 911

13   calls placed by Mr. Mohamad Hamad.

14          MS. BLOCH:  Thank you.  No further questions.

15          THE COURT:  On this redirect, is there any additional

16   cross-examination on this very narrow redirect?

17          MS. OLAIYA:  Yes, Your Honor, briefly.

18                      **RECROSS-EXAMINATION**

19   BY MS. OLAIYA:

20   Q.  The messages depicting the so-called explosions, those

21   were not sent by my client, Mr. Hamad; correct?

22   A.  I believe they were sent to him.

23   Q.  Correct.  Not by him?

24   A.  Yes.  To him.

25   Q.  Okay.  And in terms outside of the delivery confirmation,

 1    you stated that you saw delivery confirmation via the email
 2    records; correct?
 3    A.  I don't believe I said that.  I believe I said there may
 4    have been a delivery confirmation, but I'm not aware of that.
 5    That's one way that we would know how to confirm delivery.  I
 6    don't know that I saw that.
 7    Q.  Okay.  So you found no documentation or other material
 8    evidence showing that the delivery had actually been made?
 9    A.  I personally did not.
10    Q.  And now following the text exchange on July 29th, are you
11    aware of any other additional conversations or evidence that
12    any action was taken to create additional incendiary materials
13    -- or June 29th.  I am sorry.  I think I might have said July.
14    A.  Could you repeat that question one more time, just so I
15    can understand it better.
16    Q.  Absolutely.  So following the text message exchange on
17    June 29th of this year, are you aware of any additional
18    communications or evidence that any action was taken to create
19    any incendiary devices or materials?
20    A.  I don't have that information with me.  I don't have the
21    full extraction of the phone, but not to my knowledge at this
22    time.
23            MS. OLAIYA:  No further questions, Your Honor.
24            THE COURT:  Thank you.  Any redirect?
25            MS. BLOCH:  There is, Your Honor.  Just as to these

1    last couple questions.

2                    **REDIRECT EXAMINATION**

3    BY MS. BLOCH:

4    Q.  Did you obtain information that additional purchases of

5    the tubes that are used to stuff the powder in were made after

6    the date on which the explosion, the test explosion, occurred?

7    A.  Yes.  We do have that information.

8    Q.  Okay.  So there were additional purchases made.  Were

9    there email records of those purchases of the tubes?

10   A.  Yes.

11   Q.  I don't know.  Am I calling them plugs or tubes?

12   A.  They are cylindrical 1-inch wide cardboard tubes that they

13   are approximately 1 inch X 3 inches, somewhere around that

14   size range.

15   Q.  During the search of his residence, did you see any of

16   those kinds of items in the house?

17   A.  No, we did not.

18   Q.  Do you recall at this time the approximate date following

19   the test explosion when those additional tubes were purchased?

20   A.  I believe that was August 2nd.

21   Q.  2024?

22   A.  Yes.

23              MS. BLOCH:  No further questions.

24              THE COURT:  Any follow-up?

25              MS. OLAIYA:  No, Your Honor.

1          THE COURT:  We will take a ten-minute break.

2                   **(Brief recess taken)**

3          THE COURT:  So does the government intend to present

4     any other evidence or witnesses in their case-in-chief?

5          MS. BLOCH:  The government does not, Your Honor.

6          THE COURT:  So the government rests?

7          MS. BLOCH:  Yes, the government rests.

8          THE COURT:  So turning first to Attorney Olaiya,

9     would you like to proceed with your case-in-chief.

10          MS. OLAIYA:  With regard to the preliminary hearing,

11     Your Honor, we are not calling any witnesses.

12          THE COURT:  Okay.  I do have an exhibit.  Is this

13     exhibit associated with the preliminary hearing?

14          MS. OLAIYA:  No, Your Honor; with the evidentiary

15     hearing.

16          THE COURT:  On behalf of your client, you will not be

17     proceeding with testimony or moving for the admission of any

18     exhibits?

19          MS. OLAIYA:  Correct, Your Honor, for the sake of the

20     preliminary hearing.

21          THE COURT:  Thank you.  Attorney Walker, as it

22     relates to Ms. Lubit, do you have any witnesses that you

23     intend to call to testify?

24          MR. WALKER:  No, Your Honor.

25          THE COURT:  Do you have the presentation of any

1    exhibits for the Court's consideration?

2            MR. WALKER:  No, Your Honor.

3            THE COURT:  Thank you.  Does the government intend to

4    provide a closing argument to the Court related to this

5    proceeding, the preliminary hearing?

6            MS. BLOCH:  Your Honor, I just have a few thoughts to

7    just summarize what's been presented here today.  I recognize

8    that the Court has heard a lot of testimony today, and I'm

9    sure that you can, without those thoughts, arrive --

10           THE COURT:  But you're going to deliver them anyway.

11           MS. BLOCH:  Just a couple things.  I just want to say

12   that --

13           THE COURT:  You have every right to.  Please.

14           MS. BLOCH:  -- I believe that the witness has

15   provided more than ample evidence establishing probable cause

16   to believe that both Defendants have committed the violations

17   as charged in the Complaint, has provided sufficient evidence

18   to meet all elements as reflected in Paragraph 5 of the

19   Government's Exhibit No. 1, that is, that the individuals

20   defaced, damaged or destroyed religious real property or

21   attempted to do so; that the individuals acted intentionally

22   and the individuals acted because of the race, color or ethnic

23   characteristics of the individuals associated with that

24   religious real property.  It is abundantly clear from the

25   reading, and I know I painfully insisted that the witness read

1    each of the messages on July 27th into July 28th so that the

2    Court could see exactly what the parties were agreeing to,

3    exactly what the parties understood the acts that they were

4    about to commit included.

5         They established clearly that they recognized that

6    the Chabad is a religious institution, that is, a place for

7    Jews to pray.  Most importantly, they recognized that -- they

8    acknowledge that they are choosing the Jewish institutions on

9    which to place the graffiti.  The message clearly is an

10   attempt directed -- I should say the message is directed to

11   Jews.  They chose a Jewish synagogue to do it on.  They chose

12   to use a symbol directly associated with Hamas.  It fully

13   establishes every element of both the conspiracy and the

14   247(c) offense.

15        THE COURT:  Thank you.  Attorney Olaiya, on behalf of

16   your client, Mr. Hamad, did you have a closing statement?

17        MS. OLAIYA:  We are reserving argument at this time.

18        THE COURT:  Attorney Walker, on behalf of your

19   client, Ms. Lubit, do you have a closing statement you would

20   like to make for the Court's consideration?

21        MR. WALKER:  I do, Your Honor.  As the Court is

22   well-aware, the hallmark of any preliminary hearing is whether

23   or not there was a crime committed and whether Ms. Lubit is

24   the person who committed the crime.  Obviously credibility is

25   not an issue.  Part and parcel to those requirements are

1    identification, so if you look at Government Exhibit 1 on

2    Page 7 and 8, bottom of Page 7, top of Page 8, Paragraph 22

3    and 23, they both stated in there clearly it is an

4    unidentified individual, unidentified person.  It is not

5    Ms. Lubit's car.  It is not Ms. Lubit at Walmart.  It is not

6    Ms. Lubit purchasing the paint.  It is not Ms. Lubit with the

7    paint being found in the house.  It is not Ms. Lubit's house

8    being searched with all those other incendiary devices and all

9    the other context that she has nothing to do with.  She was

10   not identified whatsoever either at the location or either at

11   the house or either being searched later on.  We don't have

12   any testimony of her going to the car.  We have testimony of

13   Mr. Hamad going to her house, possibly had his car.  We don't

14   have her getting in the car, going to the location.  We have

15   an unidentified person in Paragraph 7 and Paragraph 22 and

16   Paragraph 23.  On top of that, we have two individuals because

17   the detectives or agents spoke about a person who was

18   unidentified having a female gait.

19        What do we have in Mr. Hamad's house?  We have two

20   unidentified females under the age of 18 or under the age of

21   21.  We don't know who was at that location.  We don't have

22   paint on her hands, and we don't have paint cans in her

23   possession or at her house or in any of her belongings or any

24   of her cars or houses or effects, Your Honor.  So I don't

25   believe they have met their burden as to identification, and I

1    would ask that you not find any probable cause as to

2    Ms. Lubit, Your Honor.

3              THE COURT:  Thank you.  So as it relates to the

4    preliminary hearing and whether or not there is probable

5    cause, I find that the testimony of TFO Derbish and the

6    evidence being Exhibit A, which has set forth the -- really

7    set out the investigation that was undertaken by the FBI and

8    the TFO regarding the events of July 29th and what transpired

9    at the Chabad location with the graffiti as well as the Jewish

10   Federation, I find that the testimony was both credible and

11   reliable and beyond sufficient, to some degree overwhelming.

12             Turning first to the latter points that Attorney

13   Walker made, which are well taken.  In terms of

14   identification, I would point in the record to Page 15 wherein

15   two days prior to the incident, there was communication by and

16   between Ms. Lubit and Mr. Hamad regarding tagging and/or

17   defacing Jewish property, how to do so perhaps decently with

18   some kind of consideration and things of that nature, so as it

19   relates to whether or not there is information sufficient to

20   believe that Ms. Lubit had participated in these acts, I find

21   that there is probable cause to find that she did.

22             Turning to Mr. Hamad, also I find probable cause to

23   believe that he participated in these particular crimes that

24   have been set forth in this Complaint at Paragraph 5 and 6 in

25   the sense that as it relates to the vehicle, there was some

1    argument creditworthy to his counsel about whether or not the

2    video footage ever saw him in the car.  Well, absent was any

3    testimony or any evidence that the car had ever been stolen,

4    outside of his possession.  His father Hamad testified that he

5    does operate this particular vehicle.  This particular vehicle

6    happens to be unique in characteristics because the front

7    wheels of the vehicle are distinct and different from perhaps,

8    let's say, another BMW sedan that would be on the road that's

9    also dark-colored.

10           Additionally, the Ohio license plate is registered to

11   his mother, and again, there has been no suggestion that at

12   any time that that vehicle was outside the possession or use

13   of Mr. Hamad.

14           Additionally, I mean, between the admitted Exhibit A

15   on behalf of the government and the testimony that was

16   elicited by TFO Derbish, I just find that there is no way

17   around believing that there is probable cause here to find

18   that in and around July 2024 through on or about July 2024, in

19   that district, that both Mr. Hamad and Ms. Lubit knowingly and

20   intentionally conspired, confederated and agreed to commit the

21   offense against the United States, that is, to deface, damage

22   and destroy religious real property in violation of Title 18

23   U.S.C. 247(c) contrary to the provisions of Title 18 U.S.C.

24   Section 37(1) and (2) on or about July 29, 2024 at

25   approximately 1:46 a.m.

1        I believe that they knowingly and intentionally

2   defaced and destroyed religious property that was owned by the

3   Chabad of Squirrel Hill because of racial and ethnic

4   characteristics, and that was laid bare for me in terms of the

5   communication by and between the parties, so both will be held

6   to answer in district court for the crimes that were set forth

7   in the Complaint.

8        Moving to the motion for reconsideration of the

9   conditions of release, I'll first hear from Attorney Olaiya

10  regarding the same.

11       MS. OLAIYA:  Thank you, Your Honor.  There are

12  additional exhibits that we would also like to admit.  We have

13  sent over a copy to the government.  With the Court's

14  permission, I'll approach to give the rest of the exhibits

15  that we have.

16       THE COURT:  Please.

17       MS. OLAIYA:  Thank you.  Your Honor, for your

18  consideration for this evidentiary hearing, the defense had

19  submitted Exhibits A through E, the first one being Mr. Hamad

20  and a picture of him in addition to the Airman's Creed.

21  Mr. Hamad, to our knowledge, is still an active member of the

22  National Guard.  Pending these charges, we believe he has been

23  placed on administrative leave; nevertheless, he has not been

24  discharged from his service, and we admit this as part of his

25  character evidence which the Court is allowed to consider when

1    determining what conditions, if any, are appropriate for an

2    accused person while they are on pretrial release.

3        Additionally, Your Honor, we also have Exhibit B,

4    which shows his academic achievements that he has been able to

5    accomplish, showing specifically the 364 -- I'm sorry -- the

6    location at which he achieved this and received the

7    recognition of Outstanding Academic Achievement, and he also

8    has on Exhibit C a certificate of training, both Exhibit C and

9    Exhibit B being parts of his service within the military and

10   his awarded recognition for that service.

11       Additionally, Your Honor, Exhibit D, we had a letter

12   here which essentially, Your Honor, the Court is more than

13   welcome to read it, but just to summarize, it notes

14   Mr. Hamad's character as being a kind and law-abiding person.

15   It describes him also as being a man of faith and the people

16   who have signed on to this letter never hearing or seeing

17   Mr. Hamad express any type of anger or hate for anyone based

18   on their religious affiliation, their race or any other

19   amenable characteristics they may have.

20       Attached to this exhibit, Your Honor, are

21   signatories.  We believe it is a little over 30 names in

22   total, 30 signatures from people who are within the Pittsburgh

23   community who are able to attest to Mr. Hamad's character and

24   him being a peaceful and law-abiding United States citizen.

25       Finally, Your Honor, Defendant's Exhibit E.  This is

1    a personal letter from Mr. Aaron Kuhns, who he does identify

2    as Jewish and he also owns a business.  He signed on to this

3    letter and submitted it for the Court's consideration to talk

4    about Mr. Hamad and how he has had numerous interactions and

5    conversations with him, including conversations relating to

6    faith.

7            All these exhibits, Your Honor, we the defense would

8    move to admit these exhibits for your consideration.

9            THE COURT:  Is there any objection?

10           MS. BLOCH:  No objection, Your Honor.

11           THE COURT:  So admitted.  And that would be Exhibits

12   A, B, C, D, and E on behalf of Mr. Hamad.

13           MS. OLAIYA:  Correct, Your Honor.  Just to clarify,

14   the defense, we are prepared to address arguments, but I just

15   wanted to clarify if you wanted those arguments to be done now

16   orally, or if you prefer for them to be submitted via papers

17   or motions.

18           THE COURT:  Well, it is up to you, but no, I prefer

19   them to be done orally.  I do have a question for you in terms

20   of whether you want to provide this in your summation.  I

21   would like to know what the defense counsel proposal is as it

22   relates to the conditions of release.

23           MS. OLAIYA:  So there are four specific conditions

24   that were originally imposed on Mr. Hamad that the defense is

25   seeking to be stricken.  First of those conditions, Your

1     Honor, it would be the fact that Mr. Hamad is on pretrial

2     detention.  I can also reference at Document 17 within the ECF

3     filings of this case, those are the conditions specifically in

4     case Your Honor wants to go through them.

5              THE COURT:  I have it before me.

6              MS. OLAIYA:  Okay.  So the pretrial home detention

7     that's No. 7(p)ii, and then Mr. Hamad -- the second condition

8     that defense would be addressing is the entirety of condition

9     7(g) which restricts Mr. Hamad from visiting any Jewish-owned

10    businesses, nonprofit organizations and educational

11    institutions.  But the reading of 7(g) is a little bit

12    confusing, Your Honor.

13             My understanding of this is that Jewish has been

14    applied to modify only certain nouns in this condition, but it

15    is unclear.  I think if it is technically, grammatically

16    correct, then it would be applied to every single one, but

17    either way, our argument would stand that it is

18    unConstitutional, which we will get to.

19             The third condition we would be objecting to is

20    Mr. Hamad cannot consume "extremist content."  That's at 17,

21    Your Honor.  Mostly with the fact that it's overly broad and

22    vague and unclear how that is to be defined and necessarily

23    flagged for Mr. Hamad so he can properly adhere to this

24    condition.

25             And the fourth condition we would be objecting to,

1    Your Honor, is that he must submit to drug testing which is

2    7(n).  Of course, I have arguments addressing why each of

3    those conditions are improper.

4         THE COURT:  Sure.  I would like to hear it.  This is

5    your motion.  I would like you to go ahead and present.

6         MS. OLAIYA:  Yes, Your Honor.  So first, Your Honor,

7    as to home detention, I'll start, Your Honor, with the fact

8    that Mr. Hamad has no criminal history.  None whatsoever.

9    This is his first time that he is having any type of

10   interaction with the criminal legal system.  And it notes very

11   clearly, Your Honor, within Title 18 United States Code

12   Section 3142(C)(b), it makes clear, Your Honor, that a person

13   on pretrial release is only subject to the least restrictive

14   conditions that assure that person's appearance in court as

15   well as the safety of others or the community.

16        Mr. Hamad, Your Honor, being on home detention is

17   overly restricted and, quite frankly, unnecessary at this

18   point.  The defense, Your Honor, is willing to make a

19   reasonable modification in that pretrial services could

20   maintain electronic monitoring of Mr. Hamad which would then

21   give them the ability to still monitor his movement, make sure

22   he is not leaving the country, for example, but again, that

23   has already been addressed because his passport has been

24   turned over.  He has strong family ties here to the Pittsburgh

25   community.  He, unfortunately, has an ill father which the

1       government witness testified to a bit.  He requires a lot of

2       care, and Mr. Hamad is a very, very involved person when it

3       comes to his family and his faith.  And again, he is an

4       American citizen, and this home detention has also prevented

5       him from being able to make and maintain gainful employment

6       which, of course, is also a condition of pretrial release.

7               THE COURT:  Just to be clear, it says in terms of

8       restrictions related to home detention, it doesn't say he is

9       not allowed to leave in order to gain employment, but you read

10      that as saying that he cannot leave to attempt to gain

11      employment?

12              MS. OLAIYA:  No, Your Honor.  I meant in a practical

13      sense.  Mr. Hamad has had difficulty being able to acquire a

14      job within his field of experience because of his home

15      detention, but we would be still seeking a curfew in addition

16      to maintaining the electronic monitoring, just asking for the

17      home detention portion to be removed.

18              THE COURT:  So you're saying within the last week,

19      because it was last week, right, that you were here before the

20      Court, so you're saying within the last week, he started

21      having difficulty with obtaining employment because of home

22      detention?

23              MS. OLAIYA:  Correct.  When we met with pretrial

24      services, his employment, working as a mechanic, pretrial

25      services made clear that nature of that job, since it is not a

1    formal 9:00 to 5:00 establishment, he would not be able to

2    continue with that work.

3        THE COURT:  Okay.  Thank you.

4        MS. OLAIYA:  Moving on, Your Honor, to the 7(g) in

5    its totality which restricts Mr. Hamad from visiting, again,

6    Jewish-owned businesses, nonprofit organizations, but

7    depending on how this is read, it seems like anything, any

8    noun within this condition would technically apply, the

9    modification of Jewish, so first off, Your Honor, this is

10    unConstitutional and it's violating the First Amendment in a

11    number of ways.  No. 1, the fact that Mr. Hamad, as a United

12    States citizen, he does have the right to assembly.  He has

13    the right to associate, whether it be at an educational

14    facility, nonprofit entity, he is able to do that and enjoy

15    that right as somebody who has not been convicted and who is

16    presumed innocent.

17        These conditions, Your Honor, imply that Mr. Hamad is

18    indeed guilty and do not maintain his presumption of

19    innocence.  Not to mention, Your Honor, it also goes across

20    common sense in a lot of ways, mostly because it is not clear

21    how Mr. Hamad can be expected to know what is a Jewish entity

22    or business.  It is not necessarily readily apparent with

23    every Jewish-owned business or nonprofit organization.

24    Sometimes it can be simply affiliated with other Jewish

25    entities, and again, that could be possibly something based on

1    how these conditions are currently written that would run

2    afoul of Mr. Hamad and potentially violate pretrial release.

3        And we have a number of supporters of Mr. Hamad who

4    are of the Jewish faith and who support being around him and

5    continuing to enjoy his association and accommodations with

6    him.  And not to mention, Your Honor, there is also the

7    ongoing Israeli Palestinian conflict.  It is a war between

8    nations, not religions, and there are many, many Jewish

9    entities that do not support the current Israeli efforts that

10   do support the defense of the Palestine, so for many it is not

11   a matter of two religions at odd and to take that standpoint

12   is a narrow and problematic view.

13       What would be more reasonable in place of the 7(g)

14   condition is to keep Mr. Hamad -- prohibit his restriction

15   from the Chabad Center and the Jewish Federation Building.

16   That would make much more sense and be much more reasonable.

17       Additionally, Your Honor, the condition of "extremist

18   views" and barring Mr. Hamad from viewing anything that might

19   relate to that, it is, again, unConstitutionally vague which

20   again runs afoul of the First Amendment and Mr. Hamad's rights

21   as a United States citizen.  And even taking current events as

22   an example, there might be several news stations that people

23   opposite outside the political spectrum may view or categorize

24   as extremist, but stating a political standpoint is protected

25   speech.  Limiting anything that incites violence is

 1      reasonable, but simply stating partisan points that someone
 2      else might not agree with is not lawful and our Constitution
 3      does prohibit that.
 4           Additionally, Your Honor, this condition as well as
 5      the others, they go beyond the purpose of the Bail Reform Act.
 6      Nothing within them should be interpreted as giving the
 7      government the right to sensor its citizen from news media
 8      outlets or other legitimate sources of information.
 9           Finally, Your Honor, as it relates to the drug
10      testing condition, the defense, we submit this is wholly
11      unreasonable.  You can't forget that Mr. Hamad has no criminal
12      history.  And in addition to that, he is still currently
13      enlisted within the United States military.  As such, he is
14      prohibited and he does abstain from any type of illicit drugs
15      or consuming them in any way.  He has no social history, no
16      criminal history of ever having any involvement at all with
17      drugs.  Again, to meet a more reasonable ground, there are
18      other conditions, Your Honor, that could also be addressed.
19      We think that these four are the main ones that are unduly
20      onerous on Mr. Hamad and do not conform to the least
21      restrictive condition and standard that the Bail Reform Act
22      and the United States Code offers.
23           What it does permit, Your Honor, the Bail Reform Act
24      is for this Court to look at a person's character as a whole
25      when determining conditions for their pretrial release.  So

1    this was in large part why we admitted, Your Honor, these

2    different exhibits for your consideration, to see people from

3    the community who are in support of Mr. Hamad, people of the

4    Jewish faith who the government has painted Mr. Hamad as

5    hating, which is simply not true or accurate.

6              Just overall, Your Honor, the Bail Reform Act truly

7    makes clear that what is to be considered, if or when pretrial

8    conditions of release are implemented, that again, has to only

9    be the least restrictive conditions, and the concessions that

10   the defense is willing to make we believe sufficiently

11   addresses those conditions to make sure that Mr. Hamad still

12   appears in court and that he does not pose a threat or danger

13   to members of the community.

14             So for those reasons, Your Honor, the defense

15   respectfully asks that you eliminate the overly-broad,

16   unConstitutional and also in part just unnecessary conditions

17   that Mr. Hamad is currently facing with home detention, drug

18   testing, his right to associate and also his ability to be

19   able to consume certain information from legitimate news

20   sources or outlets.

21             THE COURT:  Thank you, Attorney Olaiya.  First, I'm

22   going to take these out of order, because I'm going to handle

23   what I deem to be the easiest to address first.  I'll turn to

24   AUSA Bloch as it relates to 7, and counsel did not -- Attorney

25   Olaiya didn't mention 7, but I think they kind of go hand in

1    hand, so I'll ask for the government's position as it relates

2    to 7, and that is submit to testing for prohibited substances

3    is required.  That's N.  Participate in a program of

4    outpatient or inpatient substance abuse therapy and

5    counseling.  First I'll hear from the government on that.

6         MS. BLOCH:  Certainly, Judge.  Here is my comment.  I

7    have no evidence that indicates that he is a drug user, but

8    I'll share with the Court and what was shared with me is that

9    Mr. Hamad was mostly uncooperative in responding to questions

10   posed by pretrial services.  They asked him about prior drug

11   use, and he refused to answer.  They told him that by not

12   answering, we have to assume that you did use drugs.  Because

13   you're not sharing with us, we can't make an informed

14   assessment of that.  I do know there was one drug test taken.

15   My understanding, at least as of yesterday, is that there were

16   no results back yet.  I am not opposed to that being stricken,

17   but I just want the Court to understand that we don't have any

18   information about his history because he refused to provide.

19        THE COURT:  So Attorney Olaiya, I'll let you

20   follow-up if you have any.

21        MS. OLAIYA:  Yes, Your Honor.  If I may respond to

22   that, pretrial services, as the Court knows, routinely

23   interviews our clients when it comes to release and new

24   arrest.  In those instances, we always tell our clients when

25   or when not to answer certain questions, and sometime we will

1    take the lead to those situations and tell them whether or not

2    to answer, because we do not know the full extent of what the

3    government's evidence may be.  So there were no

4    representatives of other attorneys were also present as

5    officers of the Court with Mr. Hamad during that conversation,

6    so it was not to that extent.  Rather my office --

7          THE COURT:  Just so that I'm following, so you're

8    saying that he was not counseled by anyone at the Federal

9    Public Defenders' office to refrain from answering questions

10    regarding substance abuse?

11         MS. OLAIYA:  No.  I'm saying he was counseled and we

12    interject, so it is not as if he wasn't trying to cooperate.

13    We always just jump ahead of it before our clients even get a

14    word out.

15         THE COURT:  Okay.  As it relates to condition N and O

16    and, of course, I'm guided by 18 U.S.C. 3142(C)1(b) as

17    mentioned wherein the judicial officer is supposed to consider

18    the least restrictive combination or combinations of

19    conditions that would do one of two things:  One, ensure the

20    appearance of the Defendant in court, and two, protect any

21    person, any other person and/or the community.  As it relates

22    to N and O, they will be stricken from the conditions of

23    release.

24         Moving backwards to 7(u) as I have it here, and that

25    is about you shall not possess, view, access or otherwise use

1    material that reflects extremist or terroristic views or is

2    deemed to be inappropriate by the U.S. probation and pretrial

3    services office.  There is the argument on behalf of

4    Mr. Hamad, AUSA Bloch, that that's overly broad or vague

5    and/or not easily understood by someone who would be seeking

6    to comply.  What say the government?

7        MS. OLAIYA:  I just wanted to interject just for

8    clarification of the record that there is still electronic

9    monitoring that Mr. Hamad is on, so we are not asking for that

10   electronic monitoring to be stricken.

11       THE COURT:  Right.  I didn't raise that.  I'm taking

12   this piecemeal, so I'm only raising the idea that you raised,

13   as I understood and have here in my notes that you believe

14   that as it relates to -- which I believe you called censorship

15   in terms of the material that he is able to view and possess,

16   so that's the only thing I'm addressing.

17       MS. OLAIYA:  Yes, ma'am.  My apologies.

18       THE COURT:  AUSA Bloch, what do you have to say in

19   response, again, keeping in mind that a person needs to

20   develop enough information in order to comply?

21       MS. BLOCH:  I do understand that.  First, I don't

22   think it is unConstitutional.  I do think that pursuant to

23   3142(C)(b)(14), the Court, given the facts of the particular

24   case, can impose a condition that they deem to be reasonably

25   necessary to ensure the safety of another person in the

1    community, and that can be anything that the Court finds is

2    appropriate in the case.  I'm not suggesting -- I believe, as

3    I understand, that the probation office, and I'm sure

4    Mr. Orson can confirm this, they on their own recommended this

5    restriction.  This was not driven at least initially by the

6    government.  They retrieved language and verbiage used in a

7    couple other cases, one of which was out of this district,

8    because it is not very often that we have a case like this.

9    So they sought some input.  I do think that there needs to be

10   such a restriction; it may need to be finessed in terms of the

11   specificity of what we are seeking about.  It's hard to say,

12   like, you know, there is extremist material everywhere, so you

13   can't just identify one particular source and say, Okay.  You

14   can't go to Google, or You can't go to extremist material dot

15   com.  So it has to be broad enough that the probation office,

16   in monitoring his Internet connectivity, recognizes that he is

17   looking at material that fits that model.  So I am not

18   suggesting it is perfect.  I'm not suggesting it might not

19   need some tweaking, but I do think it is perfectly appropriate

20   in this case, and I do think that there is something of value

21   to have the Defendant not engaging in this reading and

22   indulging in extremist thought while he is pending indictment

23   and presumably trial.

24            THE COURT:  I will give Attorney Olaiya the final

25   word.

1          MS. OLAIYA:  Just that Ms. Bloch's point, it is very

2     confusing essentially.  So the computer monitoring, the

3     electronic monitoring, essentially anything that can connect

4     to the WiFi that Mr. Hamad has access to is already actively

5     being monitored by pretrial services, so putting this

6     additional overly-broad condition that can very well set

7     Mr. Hamad up for failure is unnecessary.

8          I think it is clear anything that's related to

9     explosives and cites to violence, I think that's pretty

10     obvious an objective that Mr. Hamad shouldn't be viewing that,

11     but outside of that, and the monitoring that the pretrial

12     services already have, this condition is unnecessary.  It is

13     vague.  It is confusing, and it is not the least restrictive

14     condition that needs to be imposed.  Electronic monitoring

15     already solves that.

16          MS. BLOCH:  Let me say one thing.  I think what she

17     -- electronic monitoring --

18          MS. OLAIYA:  Excuse me.  Computer monitoring.

19          MS. BLOCH:  Computer monitoring only works if there

20     is something the probation office is looking to see if the

21     pretrial detainee is accessing, whether that was child

22     pornography.  You can't have it just monitoring everything.

23     Their system won't work that way.  Their system works to look

24     for specifically things that are restricted from looking at,

25     so again, child exploitation cases, that the condition they

1    not access with intent to view, possess, go to websites that

2    speak to, you know, have conversations about child

3    exploitation, that's what the monitoring -- then the probation

4    office knows what they are looking for hits for.  If it is

5    just open-ended, there is no way they will have a hit because

6    there is no restriction.  There is no contents that they are

7    looking for him going to, so I just need to clarify that

8    factually and similarly with monitoring GPS --

9        THE COURT:  Let's not go there yet.  We are going to

10    handle this one at a time as it relates to the particular

11    conditions where Defendant is seeking to have it stricken.  It

12    will not be stricken, but I'm going to require the parties to

13    have some discussion about defining what extremists and/or

14    terroristic views mean as in it will say an extremist i.e.

15    over the following or something of that nature to give

16    Mr. Hamad some guidance so that he knows when he steps on the

17    line, over the line, or if he has not crossed the line as well

18    as it is not clear enough.

19        So today's date is the 6th, but that gives you more

20    time, so by the 8 th close of business, I expect that the

21    government will have submitted for the Court's consideration

22    language such that would be responsive enough to the concern

23    that the Court has stated here.

24        Let's go to the Jewish-owned businesses, et cetera,

25    et cetera, or nonprofits or things of that nature.  So 7(g),

1    and, of course, you heard the argument about it being

2    unConstitutional, right to assembly and associates, suggestion

3    of guilt, et cetera, as well as persons who are associated

4    with Mr. Hamad who may be of the Jewish faith who don't

5    believe he otherwise, I guess, is a threat, but I'll hear from

6    the government as it relates to -- the issue, again, is it

7    being, one, unConstitutional.  I appreciate that you mentioned

8    3142(C)(1)(b)(14), but then also in terms of is it vague in

9    terms of determining what's a Jewish organization or not.

10           I'll say that in reading this, I know from my own

11    perspective, I'm not sure that I would know every building,

12    business, association, whether it was Jewish or not.  Of

13    course, there is some that are more identifiable than others,

14    but for those that aren't, again, trying to make sure that if

15    a Defendant is otherwise going to commit a violation of this

16    condition of release, they ought to know what they are.  So

17    I'll turn to AUSA Bloch for that.

18           MS. BLOCH:  I would agree with that.  I can say this.

19    If he remains on home detention with permission to, as you

20    pointed out even in the current conditions, with permission to

21    work, to go to school, go to the doctor's, all of the things

22    that he would need to do with permission of the probation

23    office obviously in advance, I am willing to allow that to be

24    stricken.  I do agree with you, it could either be refashioned

25    to buildings that are obviously associated with either the

```
 1   practice of Jewish faith or are associated with a synagogue,
 2   but there are probably a lot of businesses owned by Jews, and
 3   I'm sure that nobody knows what those are.  I wouldn't know.
 4           THE COURT:  I would agree with that.  In turning to
 5   home detention, Mr. Hamad will remain on home detention.  He
 6   will remain with home monitoring device.  I don't need the
 7   government to speak to that, and I appreciate that you were
 8   only agreeing to the reduction of 7(g) in the event he was
 9   going to be receiving home detention, but I can say as a
10   judicial officer guided by the Bail Reform Act to comply with
11   3142(C)(1)(b), I do find that that is not a restrictive
12   condition considering the evidence that has been testified to
13   today, particularly the fact that there is still an amount of
14   explosives that exist and no one knows where they exist.
15           I found it very credible that Mr. Hamad at one point
16   was in possession of those.  They arrived at his home.  There
17   was communication between him and another person, unknown
18   individual, about those set explosives.  There were
19   photographs received by Mr. Hamad, discussion about a test run
20   as in a test run is done before something else was to happen.
21   I find that that condition is not restrictive.  So if we are
22   keeping score, as it relates to 7(g), that will be stricken.
23   As it relates to 7(n) raised by counsel, stricken.  I raised
24   7(o), stricken, and as it relates to 7(u), that is going to be
25   revised and proposed -- as it stands, this will stand as
```

1    written, 7(u); however, again, by close of business on Friday,

2    the government is to provide some language wherein it is more

3    defined such that Mr. Hamad will be well-aware of whether or

4    not he is on the line or crossed the line.  And I will give

5    counsel for Mr. Hamad an opportunity to respond.  And so if

6    the 8th is Friday, I'll give you to Wednesday this next week

7    to respond to the proposal.

8             I would recommend that counsel actually get together

9    and discuss.  It's altogether possible that at a meet and

10   confer, you may have language that you agree to, and on

11   Friday, you file a consented-to modification of only one.

12   That would be 7(u).

13            I am not on the fence as it relates to my

14   understanding of the Bail Reform Act and/or the conditions

15   being imposed, and I believe they should be.

16            Is there anything else on behalf of Mr. Hamad,

17   Attorney Olaiya.

18            MS. OLAIYA:  No, Your Honor.

19            THE COURT:  On behalf of the government, anything

20   else you would like to offer for the Court's consideration?

21            MS. BLOCH:  Nothing else, Your Honor.  Thank you very

22   much.

23            THE COURT:  With that, we are adjourned.

24                 (Matter concluded)

25                      -----

1                    C E R T I F I C A T E

2              I, TERESA M. BENSON, RMR, FCRR, certify that the
   foregoing is a correct transcript from the record of
3   proceedings in the above-entitled case.

4        S\ Teresa M. Benson
         Teresa M. Benson, RMR, FCRR
5        Official Court Reporter

6        12/4/24

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25